**CORRECTED**

2012-1250, -1347

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

PAT HUVAL RESTAURANT & OYSTER BAR, INC., AQUA FARMS
CRAWFISH, INC., CATFISH WHOLESALE, INC., CHARLES BERNARD
(doing business as Charles' Crawfish Pad), ANDRE LEGER (doing business as
Chez Francois), JIM FRUGE (doing business as Fisherman's Cove), J. BERNARD
SEAFOOD PROCESSING, INC., and FRENCH'S ENTERPRISES SEAFOOD
PEELING PLANT,

Plaintiffs,

and

JTEKT NORTH AMERICA CORPORATION
(formerly known as Koyo Corporation of U.S.A.),

Plaintiff-Appellant,

and

SKF USA, INC.,

Plaintiff-Appellant,

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION,

Defendant-Appellee,

and

UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendant-Appellee,

and

THE TIMKEN COMPANY and MPB CORPORATION,

Defendants-Appellees.

---

Appeal from the United States Court of International Trade in consolidated
case no. 06-CV-0290, Judge Gregory W. Carman.

---

## CORRECTED RESPONSE BRIEF
## OF THE TIMKEN COMPANY AND MPB CORPORATION

Terence P. Stewart
Geert De Prest
Patrick J. McDonough
STEWART AND STEWART
2100 M Street, NW, Suite 200
Washington, DC 20037
(202) 785-4185
tstewart@stewartlaw.com
*Special Counsel for Timken and
MPB, Defendants-Appellees*

October 10, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*Pat Huval Restaurant*    v.    *ITC*

No. **2012-1250, -1347**

## CERTIFICATE OF INTEREST

Counsel for the defendants-appellees **The Timken Company and MPB Corporation** certifies the following:

1.    The full name of every party or amicus represented by me is:

*The Timken Company and MPB Corporation*

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

*Not applicable.*

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

*The Timken Company has no parent company.  No publicly held company owns 10% or more of The Timken Company.  MPB Corporation is 100% owned by The Timken Company.*

4. ☐    There is no such corporation as listed in paragraph 3.

5.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

*Stewart and Stewart: Terence P. Stewart, Geert De Prest (partners); Amy S. Dwyer, Patrick J. McDonough (of counsel); J. Daniel Stirk (associate)*

| **October 10, 2014** | */s/ Terence P. Stewart* |
|---|---|
| Date | Signature of counsel |
| | **Terence P. Stewart** |
| | Printed name of counsel |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................................1

STATEMENT OF THE ISSUES..........................................................................2

STATEMENT OF THE CASE............................................................................3

STATEMENT OF THE FACTS ........................................................................4

SUMMARY OF THE ARGUMENT ...................................................................10

ARGUMENT ...................................................................................................15

I.   Standard of Review.................................................................................15

II.  The Application Of The CDSOA's Petition-Support Requirement To Preexisting Antidumping Duty Orders To Determine Eligibility For Benefits Does Not Violate The Due Process Clause Of The Fifth Amendment...................................................................................................18

    A.  SKF And JTEKT Fail To Establish That They Have A Protected Interest Implicating Due Process. .............................................................19

    B.  The Retroactive Application Of The CDSOA's Petition-Support Requirement Is Constitutional Because It Is Supported By A Legitimate Legislative Purpose..................................................................24

        1.  The retroactive application of the CDSOA's petition-support requirement is justified by a rational legislative purpose......................24

        2.  SKF's and JTEKT's arguments are unavailing. .....................................36

    C.  SKF's And JTEKT's Reliance On *Landgraf* Is Inapposite. ......................43

III. SKF's And JTEKT's Claims For Fiscal Year 2004, And JTEKT's Claims For Fiscal Year 2006 In CIT Ct No. 08-00340, Are Barred By The Two-Year Statute Of Limitations.................................................................51

    A.  SKF's FY 2004 Claim (CIT Ct. No. 06-00328) ........................................51

    B.  JTEKT's FY 2004 Claim (CIT Ct. No. 06-00324)....................................52

    C.  JTEKT's FY 2006 Claim (CIT Ct. No. 08-00340)....................................54

CONCLUSION .................................................................................................55

# TABLE OF AUTHORITIES

## CASES

*American Mfrs. Mut. Ins. Co.* v. *Sullivan,* 526 U.S. 40 (1999). ...................................... 19

*Ashley Furniture Indus., Inc. v. United States*, 734 F.3d 1306 (Fed. Cir. 2013), *cert. denied*, 574 U.S. ___ (U.S. Oct. 6, 2014) (No. 13-1367). .................................................. 6, 7

*Association of Accredited Cosmetology Schools* v. *Alexander,* 979 F.2d 859 (D.C. Cir. 1992) .................................... 22

*Ass'n of Bituminous Contractors v. Apfel,* 156 F.3d 1246 (D.C. Cir. 1998) .................................................................. 42

*Banks v. United States*, 741 F. 3d 1268 (Fed. Cir. 2014) ...................................... 17

*Board of Regents v. Roth,* 408 U.S. 564 (1972) .............................................. 19, 22

*Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624 (Fed. Cir. 2012)............................. 16, 28

*Brown Park Estates-Fairfield Development v. United States*, 127 F.3d 1449 (Fed. Cir..1997) ............................................ 52

*Candle Corp. of America v. USITC*, 374 F.3d 1087 (Fed. Cir. 2004)........................................................................ 15

*Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.,* 999 F. Supp. 1153 (N.D. Ill. 1998)......................... 43

*Commonwealth Edison Co*. v. *United States,* 271 F.3d 1327 (Fed. Cir. 2001) (en banc)........................................... 15, 16, 17, 42

*Cox v. Hart*, 260 U.S. 427 (1922) ............................................... 46

*Davon, Inc. v. Shalala*, 75 F. 3d 1114 (7th Cir. 1996) ................................... 25, 39, 42

*Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353 (Fed. Cir. 2006) ..................................................................... 15

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59 (1978) ..................................................................... 21

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) ......................................... 41, 42

*Falek v. Gonzales*, 475 F.3d 285 (5th Cir. 2007)............................................... 49

*First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed.Cir.1999)...................................................... 15

## CASES

*General Auto Service Station v. City of Chicago*, 526 F.3d 991
(7th Cir. 2008) ........................................................................... 19

*General Motors Corp. v. Romein*, 503 U.S. 181 (1992) .................................... 42, 44

*Golden Bridge Tech., Inc. v. Nokia*, Inc., 527 F.3d 1318 (Fed.
Cir. 2008) ................................................................................ 53

*Gould Inc. v. A & M Battery & Tire Serv.*, 232 F.3d 162 (3d
Cir. 2000) ................................................................................ 25

*Guangdong Wireking Housewares & Hardware v. United
States*, 745 F.3d 1194 (Fed. Cir. 2014) .......................................... 16

*Hamama v. INS*, 78 F.3d 233 (6th Cir. 1996) .......................................... 49

*Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369
(Fed. Cir. 2003) ........................................................................ 23, 41

*Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207 (10th
Cir. 2000) ................................................................................ 19

*Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009) ................................ 41

*In re Chateaugay Corp.*, 53 F.3d 478 (2d Cir. 1995) ................................ 42

*Jeffries v. Turkey Run Consolidated School District,* 492 F.2d 1
(7th Cir. 1974) .......................................................................... 19

*Koyo Corporation of U.S.A. v. United States*, 899 F. Supp. 2d
1367 (Ct. Int'l Trade 2013), *appeal docketed*, No. 13-1399
(Fed. Cir. May 14, 2013) .............................................................. 26, 33

*Landgraf* v. *USI Film Products*, 511 U.S. 244 (1994) ........ 14, 21, 31, 40, 43, 45-49

*Lieberman-Sack v. HCHP-NE*, 882 F. Supp. 249 (D.R.I. 1995) ............................ 39

*Lyng* v. *Payne,* 476 U.S. 926 (1986) ................................................ 22

*Madrid v. Gomez*, 940 F. Supp. 247 (N.D. Cal. 1996) .................................. 49

*Martin v. Hadix,* 527 U.S. 343 (1999) ................................................ 20, 21

*McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13 (1st Cir.
1993) ..................................................................................... 46

*Mohammed v. Ashcroft*, 261 F.3d 1244 (11th Cir. 2001) ................................ 49

*Mojica v. Reno*, 970 F. Supp. 130 (E.D.N.Y. 1997) .................................... 36, 37

## CASES

*Monoson v. United States,* 516 F.3d 163 (3d Cir. 2008) .................................. 20, 21

*NationsBank of Texas, NA. v. United States,* 269 F.3d 1332
(Fed. Cir. 2001) ............................................................................. 16

*New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910
F.2d 1474 (7th Cir. 1990) ............................................................. 19

*New Hampshire Ball Bearing, Inc. v. United States,* 815 F.
Supp. 2d 1301 (Ct. Int'l Trade 2012), *aff'd,* No. 12-1246
(Fed. Cir. Jun. 12, 2014) ....................................................... 26, 31, 33

*New Valley Corp. v. United States,* 119 F.3d 1576
(Fed.Cir.1997) ............................................................................. 15

*N.Y. Cent. R.R. Co. v. White,* 243 U.S. 188 (1917) .................................... 21

*NSK Corp. v. United States,* 821 F. Supp. 2d 1349
(Ct. Int'l Trade 2012) .............................................................. 26, 33

*Pat Huval Restaurant & Oyster Bar, Inc. v.
U.S. Int'l Trade Comm'n,* 823 F. Supp. 2d
1365 (Ct. Int'l Trade 2012) ............................... 3, 4, 8, 18, 26, 31, 52-55

*Pension Benefit Guar. Corp. v. R. A. Gray &
Co.,* 467 U.S. 717 (1984). ....................... 16, 17, 26-28, 31, 32, 38, 47

*Princess Cruises, Inc. v. United States,* 201 F.3d 1352 (Fed.
Cir. 2000) ...................................................................................... 16

*Princess Cruises, Inc. v. United States,* 397 F.3d 1358 (Fed.
Cir. 2005) ...................................................................................... 45

*PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n,* 409 F.
App'x 327 (Fed. Cir. 2010) .......................................................... 6

*PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n,* 684 F.3d
1374 (Fed. Cir. 2012) ................................................................... 6

*Republic of Austria v. Altmann,* 541 U.S. 677 (2004) ........................... 43

*Schaeffler Group USA, Inc. v. United States,* 808 F. Supp. 2d
1358 (Ct. Int'l Trade 2012), *appeal docketed,* No. 12-1269
(Fed. Cir. Mar. 20, 2012) ....................................................... 26, 33

*Singleton v. Wulff,* 428 U.S. 106 (1976) .................................................. 52

iv

## CASES

*Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F. 3d 1041
(Fed. Cir. 2012) ................................................................. 18

*SKF USA Inc. v. United States,* 451 F. Supp. 2d 1355 (Ct. Int'l
Trade 2006) ....................................................................... 4

*SKF USA, Inc. v. U.S. Customs & Border Prot.,* 556 F.3d 1337
(Fed. Cir. 2009) ......................................................... passim

*7KF USA, Inc. v. U.S. Customs & Border Protection*, 583 F.3d
1340 (Fed. Cir. 2009) (denying reh'g and reh'g en banc) ................... 5

*SKF USA, Inc. v. United States Customs & Border Protection,*
130 S.Ct. 3273 (May 17, 2010) (cert. denied) ...................... 5

*Tex. Peanut Farmers v. United States*, 409 F.3d 1370
(Fed.Cir.2005). ............................................................... 17

*Town of Castle Rock v. Gonzales,* 545 U.S. 748 (2005) ............... 22

*Travenol Labs., Inc. v. United States,* 118 F.3d 749 (Fed. Cir.
1997) .............................................................................. 46

*United States v. Carlton,* 512 U.S. 26 (1994) ...................... 21, 27, 28

*United Synthetics, Inc. v. United States*, 844 F. Supp. 2d 1310
(Ct. Int'l Trade 2012) ................................................... 26, 33

*Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1 (1976) ........... 16, 17, 24, 39, 47

*Wheeler v. United States,* 768 F.2d 1333 (Fed. Cir. 1985) ............... 17

*Zorzi v. County of Putnam,* 30 F.3d 885 (7th Cir.1994) ................. 19

## U.S. CONSTITUTION

U.S. Const. amend. I .......................................................... 4-7, 29, 44, 45

U.S. Const. amend. V (Due Process Clause) ............................... passim

U.S. Const. amend. XIV, § 1 (Equal Protection Clause) .................. 4, 5, 7, 29

## STATUTES

Continued Dumping and Subsidy Offset Act of 2000
    ("CDSOA") .............................................................................. passim

19 U.S.C. § 1675c ...........................................................................3, 23

19 U.S.C. § 1675c note...................................................................... 46

19 U.S.C. § 1675c(b)(1)....................................................................22, 40

19 U.S.C. § 1675c(d)(1)....................................................................26, 49

Administrative Procedures Act (APA) ............................................. 15

5 U.S.C. § 706.................................................................................. 15

5 U.S.C. § 706(2)(A)........................................................................ 15

28 U.S.C. § 1581(i) .......................................................................... 15

28 U.S.C. § 2636(i) .......................................................................... 51

28 U.S.C. § 2640(e) ......................................................................... 15

## ADMINISTRATIVE DETERMINATIONS

*Antifriction Bearings (Other Than Tapered Roller Bearings)*
    *and Parts Thereof From the Federal Republic of Germany,*
    *France, Italy, Japan, Romania, Singapore, Sweden,*
    *Thailand, and The United Kingdom*, Inv. Nos. 303-TA-19
    and 20 (Preliminary) and Inv. Nos. 731 -TA-391-399
    (Preliminary), USITC Pub. 2083 (May 1988)................................ 7, 9

*Antifriction Bearings (Other Than Tapered Roller Bearings)*
    *and Parts Thereof From the Federal Republic of Germany,*
    *France, Italy, Japan, Romania, Singapore, Sweden,*
    *Thailand, and the United Kingdom*, Inv. Nos. 303-TA-19
    and 20 (Final) and Inv. Nos. 731 -TA-391-399 (Final),
    USITC Pub. 2185 (May 1989)........................................................ 8, 9

## ADMINISTRATIVE DETERMINATIONS

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan Romania, Singapore, Sweden, Thailand, and the United Kingdom*, ITC Hearing transcript, March 30, 1989 ...................................................................................... 9

*Distribution of Continued Dumping and Subsidy Offsets to Affected Domestic Producers,* 69 Fed. Reg. 31162 (June 2, 2004) ................................................................................................... 53

*Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers,* 71 Fed. Reg. 31336 (June 1, 2006) ................................................................................................... 54

*Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, The People's Republic of China, and Romania*, Inv. Nos. 731-TA-341, 344, and 345 (Final), USITC Pub. 1983 (June 1987) ...................................................................................... 9

## RULES

Federal Circuit Rule 47.5(a) .................................................................... 1

Federal Circuit Rule 47.5(b) .................................................................... 1

FRCP 8(a).............................................................................................. 53

## STATEMENT OF RELATED CASES

**Federal Circuit Rule 47.5(a):  Whether any other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court?**

No.


**Federal Circuit Rule 47.5(b): The title and number of any case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal. If there are many related cases, they may be described generally, but the title and case number must be given for any case known to be pending in the Supreme Court, this court, or any other circuit court of appeals.**

We are aware of two cases pending before the United States Court of

Appeals for the Federal Circuit that may be affected by the Court's disposition of

this appeal.

- *Schaeffler Group USA, Inc. v. United States,* Appeal No. 2012-1269.
- *JTEKT North America Corporation v. United States,* Appeal No. 2012-1399 (stayed pending the mandate in this appeal, *Pat Huval v. United States*, 12-1250, -1347).


We are aware of two cases before the United States Court of International

Trade that may be affected by the Court's disposition of this appeal.

- *Barden Corporation v. United States*, Consol. Court No. 06-00435.
- *JTEKT North America Corporation v. United States,* Court No. 14-00127 (stayed pending final resolution of this appeal, *Pat Huval v. United States*, 12-1250, -1347).

1

## STATEMENT OF THE ISSUES

1.      Whether the application of the petition-support requirement of the Continued Dumping and Subsidy Offset Act of 2000 to preexisting antidumping duty orders to determine eligibility for benefits is constitutionally permissible and not violative of the Due Process Clause of the Fifth Amendment to the United States Constitution because such application is supported by a rational legislative purpose?

2.      Whether the claims of SKF USA and JTEKT for CDSOA distributions for certain fiscal years were untimely filed and thus barred by the two-year statute of limitations?

## STATEMENT OF THE CASE

This appeal concerns whether the application of the petition-support requirement of the Continued Dumping and Subsidy Offset Act of 2000[1] ("CDSOA") to preexisting antidumping duty orders to determine eligibility for benefits is constitutional under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

Plaintiffs-appellants, SKF USA, Inc. ("SKF") and JTEKT North America Corporation[2] ("JTEKT"), appeal the final judgment of the United States Court of International Trade ("Trade Court") holding that the CDSOA's petition-support requirement is constitutional and that "Congress did not violate Plaintiffs' Fifth Amendment due process rights in basing potential eligibility for CDSOA disbursements on a decision on whether to support the petition that Plaintiffs made prior to the enactment of the CDSOA." *Pat Huval Rest. & Oyster Bar, Inc. v. U.S. Int'l Trade Comm'n*, 823 F. Supp. 2d 1365, 1377 (Ct. Int'l Trade 2012) (JA0011).

---

[1]  Continued Dumping and Subsidy Offset Act of 2000, Pub.L. No. 106–387, § 1001–1003, 114 Stat. 1549, 1549A–72–75 (codified at 19 U.S.C. § 1675c (2000)), repealed by Deficit Reduction Act of 2005, Pub.L. 109–171, § 7601(a), 120 Stat. 4, 154 (Feb. 8, 2006; effective October 1, 2007); *see* **Exhibit 1**.

[2]  JTEKT North America Corporation ("JTEKT") was formerly known as Koyo Corporation of U.S.A. ("Koyo").  Koyo changed its name to JTEKT on April 4, 2013.  *See Pat Huval Restaurant & Oyster Bar, Inc. v. USITC,* Appeal No. 12-1250, *Plaintiff-Appellant Koyo Corporation of U.S.A.'s Motion to Reform the Caption*, ECF No. 44 (Sept. 5, 2013).

In addition, as a subsidiary and dependent claim, SKF and JTEKT challenge the Trade Court's dismissal of their claims for particular fiscal years (2004 for SKF; 2004 and 2006 for JTEKT) because their complaints for such fiscal years were untimely filed. *See Pat Huval*, 823 F. Supp. 2d at 1373-74 (JA0008-0009).

## STATEMENT OF THE FACTS

SKF and JTEKT set out background facts regarding the underlying antidumping ("AD") investigations, the statute, and judicial proceedings. *See* SKF-JTEKT Brief at 3-9. We provide the following additional facts.

This appeal is another in a long list of cases that have challenged the constitutionality of the CDSOA before this Court. All prior appeals have affirmed the constitutionality of the CDSOA. SKF, one of the appellants here, was the first appellant to challenge the CDSOA's constitutionality before this Court. In that case, at the Trade Court, SKF argued, and fully briefed, claims that the CDSOA's petition-support requirement violated its First Amendment, Equal Protection, and Due Process rights under the U.S. Constitution. *See SKF USA Inc. v. United States,* 451 F. Supp. 2d 1355, 1356 (Ct. Int'l Trade 2006) ("SKF specifically challenges the constitutionality of the CDSOA on First Amendment, Due Process and Equal Protection grounds."). In its decision, the Trade Court held that the CDSOA violated the Equal Protection guarantees of the U.S. Constitution. *SKF USA,* 451 F. Supp. 2d at 1363. In the ensuing appeal to this Court, SKF defended

the Trade Court's judgment that the CDSOA violated the Equal Protection guarantees of the U.S. Constitution.  But, as an alternative (indeed, SKF's primary) basis for affirming the Trade Court, SKF argued that the CDSOA violated the free speech guarantees of the First Amendment of the U.S. Constitution.  *See SKF USA, Inc. v. U.S. Customs & Border Protection*, 556 F.3d 1337, 1349 (Fed. Cir. 2009) ("*SKF*") ("SKF urges its First Amendment theory as its primary ground for affirming the Court of International Trade's judgment.").  SKF, however, chose not to argue to this Court that the Trade Court's judgment should also be affirmed on the alternative grounds that the CDSOA violated the Due Process guarantees of the U.S. Constitution, even though, as with its First Amendment claim, SKF had fully litigated its Due Process claim before the Trade Court.

This Court reversed the Trade Court's judgment and expressly held that the CDSOA did not violate either the First Amendment or Equal Protection guarantees of the Fifth Amendment to the U.S. Constitution.  *SKF,* 556 F.3d at 1360. Subsequently, this Court denied a request for rehearing and rehearing en banc. *SKF USA, Inc. v. U.S. Customs & Border Protection*, 583 F.3d 1340 (Fed. Cir. 2009).  The U.S. Supreme Court thereafter denied a petition for writ of certiorari. *See SKF USA, Inc. v. United States Customs & Border Protection,* 130 S.Ct. 3273 (May 17, 2010).

5

Later, because this Court held that its decision in *SKF* was "controlling" on the First Amendment constitutional issues presented in the PS Chez Sidney appeal, this Court later summarily reversed the Trade Court's judgment that the CDSOA violated the First Amendment. *PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*, 409 F. App'x 327, 329 (Fed. Cir. 2010). In the same case, this Court also reaffirmed that "the constitutionality of the Byrd Amendment . . . was decided in *SKF*." *PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*, 684 F.3d 1374, 1379 n.3 (Fed. Cir. 2012) (citing *SKF,* 556 F.3d at 1360).

This Court again addressed the constitutionality of the CDSOA in the appeals of Ashley Furniture and Ethan Allen Global where this Court reaffirmed its holding in *SKF* that the CDSOA was constitutional under the First Amendment, confirmed that the "plain language of the statute requires 'support of the petition' in order to obtain a distribution," and confirmed that "a producer who never indicates support for the petition by letter or through questionnaire response cannot be an ADP [affected domestic producer]." *Ashley Furniture Indus., Inc. v. United States*, 734 F.3d 1306, 1311 (Fed. Cir. 2013) ("*Ashley*") (deciding both the *Ashley* and *Ethan Allen* appeals). The Court held that its decision was "consistent with both *SKF* and *Chez Sidney*." *Id.* This Court denied rehearing and rehearing en banc on January 3, 2014. On May 2, 2014, Ashley and Ethan Allen filed a Petition for a writ of certiorari at the U.S. Supreme Court. *See Ashley Furniture Industries,*

6

*Inc. v. United States*, 734 F.3d 1306 (Fed. Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. 3677 (U.S. May 2, 2014) (No. 13-1367). On October 6, 2014, the U.S. Supreme Court denied Ashley's and Ethan Allen's petition for certiorari. *See Ashley Furniture Industries, Inc. v. United States*, 734 F.3d 1306 (Fed. Cir. 2013), *cert. denied*, 574 U.S. ___ (U.S. Oct. 6, 2014) (No. 13-1367).

The *Ashley-Ethan Allen* decision also rejected the argument that intervening Supreme Court decisions issued subsequent to *SKF* had implicitly overturned *SKF* by undermining this Court's First Amendment analysis and changing the requisite level of scrutiny appropriate for the CDSOA. *See Ashley,* 734 F.3d at 1310.

Appellant SKF in this action is the same party whose First Amendment and Equal Protection challenges to the CDSOA were rejected by this Court's *SKF* decision. In *SKF*, the Court noted that SKF had actively opposed the AFB petitions by, among other things, opposing the petition in its questionnaire responses, testifying in opposition at both the preliminary conference and final hearing held by the International Trade Commission, and filing opposing briefs. *See SKF,* 556 F.3d at 1343, 1358-59.[3]

---

[3]  *See also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and The United Kingdom*, Inv. Nos. 303-TA-19 and 20 (Preliminary) and Inv. Nos. 731-TA-391-399 (Preliminary), USITC Pub. 2083 (May 1988) at B-21 and 22 (listing counsel for SKF as appearing at the ITC conference "in opposition to the imposition of

It is undisputed that JTEKT[4], like SKF, also opposed the bearings petitions in the same manner as SKF. *See below.* The Trade Court recognized that the "facts as pled" placed JTEKT "on the same footing as other potential claimants who did not support the petition, such as SKF." *Pat Huval*, 823 F. Supp. 2d at 1377 (JA0010) (citing and quoting *SKF,* 556 F.3d at 1343: "Since it was a domestic producer, SKF also responded to the ITC's questionnaire, but stated that it opposed the antidumping petition."). Indeed, JTEKT is on all fours with SKF in terms of its active opposition to the bearings petitions.

- Like SKF, JTEKT is a U.S. affiliate of a foreign bearings company charged with dumping and found to have been a source of dumped bearings in the original investigation(s);

- Like SKF, JTEKT opposed the bearings petitions in both preliminary and final questionnaire responses;[5]

---

countervailing and antidumping duties"); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, Inv. Nos. 303-TA-19 and 20 (Final) and Inv. Nos. 731-TA-391-399 (Final), USITC Pub. 2185 (May 1989) at A-24 (noting "opposition to the petition" by foreign-owned U.S. producers).

[4] Appellant JTEKT was formerly known as Koyo Corporation of U.S.A., as indicated in the caption of this appeal.

[5] *See* JA0111-0112: excerpt from Final Koyo USA Questionnaire Response dated March 20, 1987 opposing the tapered roller bearing petition; JA0113-0114: excerpt from Preliminary Koyo USA Questionnaire Response dated April 20, 1988 opposing the antifriction bearing petition; JA0115-0116: excerpt from Final Koyo USA Questionnaire Response dated January 31, 1989 opposing the antifriction bearing petition.

- Like SKF, JTEKT filed pre-hearing and post-hearing briefs at the ITC opposing relief in the bearings investigations;[6] and

- Like SKF, JTEKT appeared at the ITC's public hearings in the bearings investigations in opposition to relief.[7]

---

[6] *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan Romania, Singapore, Sweden, Thailand, and the United Kingdom*, Inv. Nos. 303-TA-19 and 20 (Final) and Inv. Nos. 731-TA-391-399 (Final), USITC Pub. 2185 (May 1989) at 21 n.10 (noting pre-hearing brief by Koyo Seiko).

[7] JTEKT (under its former name Koyo) actively opposed the antifriction bearings petitions at the ITC conference and hearing. *See Antifriction Bearings (Other Than Tapered Roller Bearings) And Parts Thereof From The Federal Republic Of Germany, France, Italy, Japan Romania, Singapore, Sweden, Thailand, And The United Kingdom*, Inv. Nos. 303-TA-19 and 20 (Preliminary) and Inv. Nos. 731-TA-391-399 (Preliminary), USITC Pub. 2083 (May 1988) at B-22 (listing counsel for "Koyo Seiko Co., Ltd." and "Koyo Corporation of USA" as appearing at the ITC conference "in opposition to the imposition of countervailing and antidumping duties"); *see also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan Romania, Singapore, Sweden, Thailand, and the United Kingdom*, ITC Hearing transcript, March 30, 1989, at 9 (listing appearance of counsel for "Koyo Seiko Company" and "Koyo Corporation U.S.A." at the ITC hearing "in opposition to the imposition of antidumping and countervailing duties") and 185-189 (testimony of Chuck Brandt, Vice President in Charge of Sales for Koyo Corporation USA in opposition to the petition).

JTEKT (as Koyo) also actively opposed the 1987 tapered roller bearings investigation at the ITC hearing. *See Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, The People's Republic of China, and Romania*, Inv. Nos. 731-TA-341, 344, and 345 (Final), USITC Pub. 1983 (June 1987) at A-98-99 (counsel for "Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., its U.S. subsidiaries" appeared "in opposition to the imposition of antidumping duties").

Thus, there is no question that both SKF and JTEKT actively opposed the bearings petitions, and that, for all relevant CDSOA purposes, both SKF and JTEKT stand in identical positions.

## SUMMARY OF THE ARGUMENT

SKF and JTEKT have no valid legal claim. The retroactive application of the CDSOA's petition-support requirement does not violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

**<u>SKF and JTEKT fail to establish a protected interest implicating Due Process.</u>**

The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty. Before SKF and JTEKT may assert a due process argument — procedural or substantive — they must establish that they have a legitimate claim of entitlement to the right being asserted. SKF and JTEKT fail to identify any protected interest in property or liberty of which they have been deprived by virtue of the CDSOA's petition-support requirement. While SKF and JTEKT assert that they relied on existing legal rules when they opposed the petitions, their reliance and unilateral expectations do not amount to property interests implicating substantive due process. Even assuming *arguendo* that SKF and JTEKT had reliance interests in the antidumping law status quo, the CDSOA did not affect that interest because the CDSOA did not substantively

change the antidumping law.  The lack of a protected property interest is fatal to their due process claim.

## The retroactive application of the CDSOA's petition-support requirement is supported by a legitimate legislative purpose.

The test of due process in assessing economic legislation is rationality, and the same rationality standard applies to both prospective and retroactive aspects of legislation.  SKF and JTEKT must show that Congress acted in an arbitrary and irrational way in enacting the retroactive aspects of the CDSOA's petition-support requirement.  They fail to do so.

Congress expressly prescribed that the CDSOA covers all antidumping orders in effect on January 1, 1999.  This retroactive aspect of the CDSOA, however, does not offend due process.  Retroactive statutes are not prohibited by the Due Process Clause.  The retroactive application of a statute satisfies constitutional due process concerns simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose. The CDSOA's petition-support requirement easily passes this constitutional test.

This Court has held that Congress had a substantial interest in enforcing the trade laws and that the CDSOA serves the rational legislative purpose of rewarding parties who assist the government's enforcement of the antidumping law.  This interest and purpose rationally applies equally to antidumping orders in existence when CDSOA was enacted and to petitions filed after enactment.  SKF and JTEKT

11

wrongly assert that the CDSOA's legislative purpose was to "incentivize" litigation support activities. Rewarding and incentivizing are not the same things. This Court has held that the legislative purpose of the CDSOA was to <u>reward</u>, not incentivize.

Given the statute's purpose to <u>reward</u>, it would have been arbitrary and irrational for Congress to reward only domestic producers who supported future petitions but to deny the same reward to domestic producers who had supported petitions that resulted in orders already in existence when the CDSOA was enacted. Thus, Congress reasonably concluded that, where antidumping orders have been issued but dumping still continues, the statute's purpose of rewarding initiators and supporters of trade law enforcement should apply equally to existing orders as well as to future orders. By doing so, Congress gave comprehensive scope to the statute's salutary purpose which would be more fully effectuated by rewarding all of those domestic producers who assisted the government's trade law enforcement whether or not the CDSOA was in place when they provided that assistance and support. This is an eminently rational justification supporting the retroactive application of the petition-support requirement.

## **SKF's and JTEKT's arguments are unavailing.**

SKF and JTEKT fail their burden to show that the retroactive application of the CDSOA's petition-support requirement is irrational. SKF and JTEKT claim

12

that the CDSOA was unforeseen and upset their settled expectations.  But, unforeseeability of changes to law and settled expectations are not sound bases for finding a due process violation.  SKF and JTEKT claim it is irrational to reward pre-CDSOA orders because the legislative purpose was to incentivize litigation support activities.  SKF and JTEKT misstate the legislative purpose.  The CDSOA's legislative purpose recognized by this Court was to reward producers for initiating or supporting successful trade proceedings, not to incentivize litigation support.  SKF and JTEKT argue that retroactive application is irrational because some eligible producers do not actually receive distributions (*e.g*., if no duties have been assessed).  But that is how the statute is intended to operate; it does not show the CDSOA is irrational.  CDSOA distributions occur only where dumping continues after an order is issued; it is not an automatic benefit for all orders.  SKF and JTEKT argue that CDSOA is a "means of retribution" against companies opposing petitions because the CDSOA's successor provisions deny distributions to opposing companies forever.  Not only have SKF and JTEKT not challenged the acquisition provision, but this Court has repeatedly found that the CDSOA is not a penal law.  SKF and JTEKT argue that the CDSOA's retroactive effect offends Due Process because of its severity, *i.e.*, the extent of its temporal reach.  But, the length of time that a retroactive statute reaches back is not determinative of a due process violation.

13

## **SKF's and JTEKT's reliance on *Landgraf* is inapposite.**

SKF and JTEKT claim that the CDSOA violates due process because the statute has impermissible retroactive effects, citing *Landgraf* v. *USI Film Products*, 511 U.S. 244, 266 (1994). But the factors identified in that case for determining whether to construe a statute as retroactive say nothing about, and are inapposite to, the test for invalidating legislation under the Due Process Clause. *Landgraf* did not even purport to address that issue. Thus, SKF's and JTEKT's reliance on *Landgraf* is wholly misplaced.

## **SKF's and JTEKT's claims regarding the statute of limitations.**

The Trade Court barred certain fiscal year claims of SKF and JTEKT because they were filed more than two years after the cause of action accrued when Customs published its notice of intent to make distributions for that fiscal year. SKF's and JTEKT's arguments that their complaints were timely are meritless. The Trade Court's determinations were correct and should be affirmed.

# ARGUMENT

## I.  STANDARD OF REVIEW

This Court reviews the dismissal of an action for failure to state a claim upon which relief may be granted without deference.  *See First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1286-87 (Fed.Cir.1999).  "In so doing, [this Court] also 'assume[s] that all well-pled factual assertions are true and make[s] all reasonable inferences in favor of' [the plaintiff] … to the extent that such allegations are relevant to the constitutional issues."  *Commonwealth Edison C*o. v. *United States,* 271 F.3d 1327, 1338 (Fed. Cir. 2001) (en banc), quoting *New Valley Corp. v. United States,* 119 F.3d 1576, 1580 (Fed. Cir. 1997).

In cases arising under 28 U.S.C. § 1581(i), the Court applies the standard of review provided in the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.  *See* 28 U.S.C. § 2640(e).  This Court "will set aside Customs' denial of offset distributions only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353, 1354 (Fed. Cir. 2006), quoting *Candle Corp. of America v. U.S. Int'l Trade Comm'n,* 374 F.3d 1087, 1091 (Fed. Cir. 2004), citing 5 U.S.C. § 706(2)(A).

The APA also provides that the Court "shall … interpret constitutional and statutory provisions …."  5 U.S.C. § 706.  "The determination of the

constitutionality of a statute is a question of law, which this court reviews without deference." *NationsBank of Texas, NA. v. United States,* 269 F.3d 1332, 1335 (Fed. Cir. 2001). Thus, the Court reviews the Trade Court's determination of the constitutionality of a statute *de novo. See Guangdong Wireking Housewares & Hardware v. United States*, 745 F.3d 1194, 1200 (Fed. Cir. 2014); *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624, 627 (Fed. Cir. 2012); *Princess Cruises, Inc. v. United States*, 201 F.3d 1352, 1357 (Fed. Cir. 2000).

Where a statute is challenged as violating the Due Process Clause based on retroactivity, "[t]he standard of review … is well-settled." *Commonwealth Edison,* 271 F.3d at 1341.

> As the Supreme Court stated in [*Usery v.*] *Turner Elkhorn,* 428 U.S. [1], at 15, 96 S.Ct. 2882 [(1976)], "[i]t is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." So too the Supreme Court observed in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984):
>
> > Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.

> *Id.* at 729, 104 S.Ct. 2709 (citing *Turner Elkhorn,* 428
> U.S. at 15-16, 96 S.Ct. 2882).  Where the basis for the
> challenge is retroactivity, the Supreme Court has held
> that Due Process is satisfied "simply by showing that the
> retroactive application of the legislation is itself justified
> by a rational legislative purpose."  *Id.* at 730, 96 S.Ct.
> 2882.

*Commonwealth Edison,* 271 F.3d at 1341.  In such Due Process cases, "the federal

courts are not assigned the task of making policy, determining a fair outcome, or

determining the actual state of facts."  *Commonwealth Edison,* 271 F.3d at 1342.

Rather, they "are charged simply with determining whether the congressional

action was rational" and "[u]nder that rational purpose standard it will be a rare

circumstance where federal legislation that is retroactive will be held

unconstitutional under the Due Process Clause."  *Commonwealth Edison,* 271 F.3d

at 1342.  Accordingly, because "[t]he presumption of constitutionality is extremely

difficult to overcome," *Wheeler v. United States,* 768 F.2d 1333, 1337 (Fed. Cir.

1985), "such Due Process challenges will only succeed in the rarest of cases."

*Commonwealth Edison,* 271 F.3d at 1345.

The Court applies a de novo standard of review to a trial court's dismissal for

lack of jurisdiction.  *Sioux Honey Ass'n v. Hartford Fire Ins. Co*., 672 F. 3d 1041,

1049 (Fed. Cir. 2012); *Banks v. United States*, 741 F. 3d 1268, 1275 (Fed. Cir.

2014); *Tex. Peanut Farmers v. United States*, 409 F.3d 1370, 1372 (Fed. Cir.

2005).

## II. THE APPLICATION OF THE CDSOA'S PETITION-SUPPORT REQUIREMENT TO PREEXISTING ANTIDUMPING DUTY ORDERS TO DETERMINE ELIGIBILITY FOR BENEFITS DOES NOT VIOLATE THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT.

SKF and JTEKT claim that the CDSOA's petition-support requirement, as applied to them, is impermissibly retroactive in violation of due process. This claim fails at every step. SKF's and JTEKT's due process claims lack merit because application of the CDSOA to SKF and JTEKT did not impair any protected property interest or involve any cognizable retroactivity. Moreover, even assuming that applying the petition-support requirement of the CDSOA retroactively to SKF and JTEKT affects a protected property interest implicating the Due Process Clause, SKF's and JTEKT's arguments still fail. The retroactive application of the CDSOA's petition-support requirement readily satisfies the governing rationality standard for constitutionality.

The Trade Court dismissed SKF's and JTEKT's retroactive Due Process claims for failure to state a claim upon which relief could be granted. *See Pat Huval,* 823 F. Supp. 2d at 1377 (JA0011). Because SKF and JTEKT again fail to show that their due process claims have any validity, this Court should affirm the Trade Court's dismissal.

18

**A.    SKF And JTEKT Fail To Establish That They Have A
Protected Interest Implicating Due Process.**

The Due Process Clause of the Fifth Amendment states that "[n]o person

shall be … deprived of life, liberty, or property, without due process of law."  "The

first inquiry in every due process challenge is whether the plaintiff has been deprived of

a protected interest in 'property' or 'liberty.'"  *American Mfrs. Mut. Ins. Co.* v. *Sullivan,*

526 U.S. 40, 59 (1999).  Only after finding a deprivation of a protected interest is it

relevant whether the statute comports with due process.

"Before a party may assert a due process argument — procedural or

substantive — it must establish that it has a 'legitimate claim of entitlement' to the

right being asserted."  *New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910

F.2d 1474, 1479 (7th Cir. 1990) (quoting *Board of Regents v. Roth,* 408 U.S. 564

(1972)); *see also Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210

(10th Cir. 2000) ("[T]o prevail on either a procedural or substantive due process

claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of

a protectible property interest.").  In other words, "[i]ntrusion upon a cognizable

property interest is a threshold prerequisite to a substantive due process claim."

*General Auto Service Station v. City of Chicago*, 526 F.3d 991, 1002 (7th Cir.

2008).  "Consequently, the lack of a protected property interest is fatal to a

substantive due process claim."  *General Auto,* 526 F.3d at 1002, citing *Zorzi v.*

*County of Putnam,* 30 F.3d 885, 894 (7th Cir.1994); *see also Jeffries v. Turkey Run*

19

*Consolidated School District,* 492 F.2d 1, 4 (7th Cir. 1974) ("Accordingly, the absence of any claim by the plaintiff that an interest in liberty or property has been impaired is a fatal defect in her substantive due process argument.").

SKF and JTEKT fail to identify any protected interest in property or liberty of which they have been deprived by virtue of the CDSOA's petition-support requirement. Thus, the lack of a protected property interest is fatal to their due process claim.

The most that SKF and JTEKT contend is that they "relied upon the then-existing legal rules when they decided not to 'check the box' and support the AFBs antidumping petition." SKF-JTEKT Brief at 14. SKF and JTEKT[8] further state that, when they opposed the petition, "they did so based on a reasonable reliance that their position would be used only in the ITC's injury analysis, and not to competitively burden the company." SKF-JTEKT Brief at 18. They claim that they "had settled expectations based on current law and practice that their conduct would not result in financial benefit to their competitors or competitive harm to themselves."[9] *Id.* They claim that their reliance and expectations "were upended

---

[8]  Formerly known as Koyo.

[9]  SKF and JTEKT cite *Martin v. Hadix,* 527 U.S. 343, 360 (1999) and *Monoson v. United States,* 516 F.3d 163, 168 n.2 (3d Cir. 2008) in support of their argument that they "had settled expectations based on current law and practice that their conduct would not result in financial benefit to their competitors or competitive harm to themselves." *See* SKF-JTEKT Brief at 18. Neither of

by the retroactive application of the CDSOA." *Id.* SKF and JTEKT are wrong –

their reliance and unilateral expectations do not amount to property interests

implicating substantive due process.

Before the CDSOA's enactment, SKF and JTEKT had no vested rights

under existing antidumping law, or settled expectations in static trade laws. No

one, including SKF and JTEKT, has a vested right in the hope that a law will not

change. That principle is well-established. The Supreme Court has said: "Our

cases have clearly established that '[a] person has no property, no vested interest,

in any rule of the common law.'" *Duke Power Co. v. Carolina Envtl. Study*

*Group, Inc.*, 438 U.S. 59, 88 n.32 (1978) (citation omitted). With respect to tax

law, the Supreme Court has said that "[t]ax legislation is not a promise, and a

taxpayer has no vested right in the Internal Revenue Code." *United States v.*

*Carlton,* 512 U.S. 26, 33 (1994). Thus, "[n]o person has a vested interest in any

rule of law, entitling him to insist that it shall remain unchanged for his benefit."

*N.Y. Cent. R.R. Co. v. White,* 243 U.S. 188, 198 (1917).

"To have a property interest in a benefit, a person clearly must have more

than an abstract need or desire" and "more than a unilateral expectation of it. He

---

those cases concerns Due Process or any constitutional issues. Rather, both of
those cases examine whether a statute should be construed as retroactive by
applying factors outlined by the Supreme Court in *Landgraf*, 511 U.S. at 270.
*See Martin,* 572 U.S. at 352-53, 358-59; *Monoson*, 516 F.3d at 167.

must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 756 (2005), quoting *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Before the CDSOA's enactment in 2000, neither SKF nor JTEKT had any claim of entitlement to CDSOA distributions because such distributions had never existed before. After the CDSOA's enactment, neither SKF nor JTEKT could claim that they had been deprived of any interest in any vested right, because the statute did not give them any claim of entitlement to CDSOA distributions. *See* 19 U.S.C. § 1675c(b)(1) (neither SKF nor JTEKT meet the definition of "affected domestic producer"). Neither SKF nor JTEKT had any "vested rights" in future eligibility to CDSOA distributions. *See Town of Castle Rock,* 545 U.S. at 756 (abstract desire for or unilateral expectation of a benefit does not establish a property interest); s*ee also Association of Accredited Cosmetology Schools* v. *Alexander,* 979 F.2d 859, 864 (D.C. Cir. 1992) (plaintiffs had no "vested rights" to future eligibility to participate in government program, and any expectation to future eligibility does not constitute a vested interest). The Supreme Court has said: "We have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendment." *Lyng* v. *Payne,* 476 U.S. 926, 942 (1986).

22

Moreover, even assuming *arguendo* that SKF and JTEKT have some vested interest in their reliance on, and expectations of, antidumping law status quo, which they do not, the CDSOA did not affect that interest because the CDSOA did not substantively change the antidumping law. While this Court found that the CDSOA "enhance[d]" the "remedial nature" of the antidumping law, *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1380 (Fed. Cir. 2003), the CDSOA did not change how dumping margins were calculated or impose additional liability on parties like SKF and JTEKT if they are found to be dumping in administrative reviews. *See* 19 U.S.C. § 1675c (no changes made to antidumping margins calculations or antidumping liability). For instance, the CDSOA did not affect how dumping is determined—the dumping calculus was unchanged by passage of the CDSOA. *See Huaiyin*, 322 F.3d at 1380 ("the antidumping duties assessed under the current collection regime are identical to those assessed prior to implementation of the Byrd Amendment"). The CDSOA left the antidumping law exactly the same in terms of commencement of cases, facts examined, methodology used to determine dumping, considerations of whether an industry was materially injured, the conduct of administrative reviews, and the amount of dumping found (or not). Nor did the CDSOA cause any domestic producer to lose any preexisting remedy. Instead, all that Congress did in enacting the CDSOA was to address the problem of continued dumping or

23

subsidization after antidumping or countervailing duty orders are imposed by rewarding, through distribution of assessed AD and CVD duties, those domestic producers who aided the government's enforcement of the trade laws by petitioning for or supporting successful AD and CVD proceedings.

In summary, SKF and JTEKT fail to identify the due process "threshold prerequisite" of a protected interest, much less demonstrate that the CDSOA deprives them of any protected interest that implicates the Due Process Clause. Accordingly, because SKF's and JTEKT's due process claim lacks the necessary predicate of a protected interest, it should be rejected.

**B.    The Retroactive Application Of The CDSOA's Petition-Support Requirement Is Constitutional Because It Is Supported By A Legitimate Legislative Purpose.**

1. *The retroactive application of the CDSOA's petition-support requirement is justified by a rational legislative purpose.*

It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*** 

The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, ….

*Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15 (1976). Thus, the Supreme Court has "stated that both the retroactive and the prospective aspects [of

legislation] are subject to the test of due process.  The test of due process in assessing economic legislation is rationality." *Davon, Inc. v. Shalala*, 75 F.3d 1114, 1123 (7th Cir. 1996).  The same rationality standard applies to both prospective and retroactive aspects of legislation.

In order to prove that the CDSOA, a statute "adjusting the burdens and benefits of economic life," violates substantive due process, SKF and JTEKT must show that Congress "acted in an arbitrary and irrational way" by enacting the legislation.  In applying this rational-basis standard, the CDSOA "need only be justifiable on some rational basis"; "it is not necessary that Congress have actually articulated a particular rational basis." *Gould Inc. v. A & M Battery & Tire Serv.*, 232 F.3d 162, 170 (3d Cir. 2000).  Thus, SKF and JTEKT must show that Congress had no conceivable rational legislative purpose in enacting the retroactive aspects of the CDSOA, whether or not Congress itself articulated a rational purpose.  SKF and JTEKT fail to do so.

SKF and JTEKT assert that the retroactive application of the CDSOA's petition-support requirement has "no rational basis" (SKF-JTEKT Brief at 10) and "is not rationally related to a legitimate government purpose" (*id.* at 19), but they fail to support this claim – because they cannot.  Even assuming *arguendo* that SKF and JTEKT have a protected interest affected by application of the CDSOA's petition-support requirement, SKF's and JTEKT's due process argument still must

25

fail.  Where the basis for a constitutional challenge to legislation is retroactivity,

the Supreme Court has held that Due Process is satisfied "simply by showing that

the retroactive application of the legislation is itself justified by a rational

legislative purpose."  *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S.

717, 730 (1984).  The CDSOA's petition-support requirement easily passes this

constitutional test.

Congress expressly prescribed that the temporal reach of the CDSOA

extends to antidumping orders in effect on January 1, 1999.  *See* 19 U.S.C. §

1675c(d)(1) (applying to "orders or findings in effect on January 1, 1999, or

thereafter").  In that respect, the CDSOA's petition-support requirement may be

assumed to have retroactive application.[10]  But, that fact itself does not offend due

---

[10]  The Trade Court observed that "CDSOA's petition support requirement has *a retroactive aspect* in that it conditions the receipt of distributions on support decisions including support decisions that were made before the statute was passed."  *New Hampshire Ball Bearing v. United States*, 815 F. Supp. 2d 1301, 1307 (Ct. Int'l Trade 2012) (emphasis added), *aff'd*, No. 12-1246 (Fed. Cir. Jun. 12, 2014) (summary affirmance).  The Trade Court followed this decision in *Pat Huval.  See* 823 F. Supp. 2d at 1377 (JA0011).

The Trade Court made similar observations in the following decisions: *Schaeffler Group USA, Inc. v. United States*, 808 F. Supp. 2d 1358, 1363-64 (Ct. Int'l Trade 2012), *appeal docketed*, No. 12-1269 (Fed. Cir. Mar. 20, 2012); *NSK Corp. v. United States*, 821 F. Supp. 2d 1349, 1357-58 (Ct. Int'l Trade 2012); *United Synthetics, Inc. v. United States*, 844 F. Supp. 2d 1310, 1321-23 (Ct. Int'l Trade 2012); *Koyo Corporation of U.S.A. v. United States*, 899 F. Supp. 2d 1367, 1372 (Ct. Int'l Trade 2013), *appeal docketed*, No. 13-1399 (Fed. Cir. May 14, 2013).

process.  Retroactive statutes are not prohibited by the Due Process Clause.

Indeed, "the strong deference accorded legislation in the field of national economic

policy is no less applicable when that legislation is applied retroactively." *Pension

Benefit*, 467 U.S. at 729.

Where Congress has prescribed that a statute applies retroactively, as it did

in the CDSOA, the only basis for challenging its retroactive application is a

constitutional one.  The Supreme Court has noted that, absent a constitutional

violation, "the potential unfairness of retroactive civil legislation is not a sufficient

reason for a court to fail to give a statute its intended scope."  (referring to the Ex

Post Facto Clause, the Takings Clause, the prohibitions on "Bills of Attainder",

and the Due Process Clause as anti-retroactivity provisions in the Constitution).

As noted, the Supreme Court has held that the retroactive application of a

statute satisfies constitutional due process concerns "simply by showing that the

retroactive application of the legislation is itself justified by a rational legislative

purpose." *Pension Benefit*, 467 U.S. at 730.  So also, this Court has said:

> [R]etroactive legislation, …, "must meet the test of due
> process." *Pension Benefit Guar. Corp. v. R.A. Gray &
> Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 81 L.Ed.2d 601
> (1984).  "Provided that the retroactive application of a
> statute is supported by a legitimate legislative purpose
> furthered by rational means, judgments about the wisdom
> of such legislation remain within the exclusive province
> of the legislative and executive branches." *Id.* at 729,
> 104 S.Ct. 2709; *see also United States v. Carlton,* 512
> U.S. 26, 30-31, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994).

27

> This "'burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.'" *Carlton,* 512 U.S. at 31, 114 S.Ct. 2018 (quoting *Pension Benefit,* 467 U.S. at 729-30, 104 S.Ct. 2709 (1984)).

*Brooks,* 702 F.3d at 628.

The CDSOA's petition-support requirement easily meets the test of a rational legislative purpose supporting a retroactive application. SKF and JTEKT acknowledge that this Court has held that "the purpose of the Byrd Amendment's limitation of eligible recipients was to reward injured parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings." *See* SKF-JTEKT Brief at 14, quoting *SKF,* 556 F.3d at 1352. But, SKF and JTEKT fail to explain why the rational legislative purpose of the CDSOA which this Court identified in *SKF* does not also suffice to uphold the retroactive application of the CDSOA's petition-support requirement against a Due Process challenge.

In *SKF*, this Court held that Congress had a substantial interest in enforcing the trade laws and that the CDSOA serves the rational legislative purpose of rewarding parties who assist the government's enforcement of the antidumping law. *SKF*, 556 F.3d at 1355, 1360. In *SKF*, this Court specifically considered whether the CDSOA's petition-support requirement, in the context of retroactive

application to SKF, was constitutional under the First Amendment and the Equal

Protection Clause. This Court held that it was:

> In summary, the Byrd Amendment is within the constitutional power of Congress to enact, furthers the government's substantial interest in enforcing the trade laws, and is not overly broad. We hold that the Byrd Amendment is valid under the First Amendment.
>
> Because it serves a substantial government interest, the Byrd Amendment is also clearly not violative of equal protection under the rational basis standard.

*SKF*, 556 F.3d at 1360.

With respect to the CDSOA's legislative purpose, this Court held:

> The purpose of the Byrd Amendment's limitation of eligible recipients was to <u>reward</u> injured parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings.

*SKF*, 556 F.3d at 1352 (emphasis added).

> [P]reventing dumping is a substantial government interest.

*Id.* at 1355.

> [The CDSOA] directly advances the government's substantial interest in trade law enforcement by <u>rewarding</u> parties who assist in this enforcement. The government has a substantial interest in <u>rewarding</u> those who assist in the enforcement of government policy.

*Id.* (emphasis added).

> It was thus rational for Congress to conclude that those who did not support the petition should not be <u>rewarded</u>.

*Id.* at 1359 (emphasis added).

> [The CDSOA] is rationally related to the government's legitimate purpose of <u>rewarding</u> parties who promote the government's policy against dumping.

*Id.* at 1360 (emphasis added).

This same combination of interests and purposes supporting the CDSOA's petition-support requirement would rationally apply either to antidumping orders in existence at the time of the CDSOA's enactment or to petitions filed after the CDSOA's enactment. Congress reasonably concluded that, where antidumping orders have been issued but dumping still continues, the statute's purpose of rewarding initiators and supporters of trade law enforcement should apply equally to existing orders as well as to future orders. By doing so, Congress gave comprehensive scope to the statute's salutary purpose of rewarding those producers who had assisted the government's trade law enforcement.

It was not irrational for Congress to thus conclude that the legislative interests and purposes of the CDSOA identified by this Court in *SKF* would be more fully effectuated by applying the CDSOA's petition-support requirement to the roughly 350 antidumping and countervailing duty orders in effect on January 1, 1999, rather than only to orders issued after the CDSOA was enacted. The Trade Court reached this very conclusion:

> We reasoned that "[i]t was not arbitrary or irrational for
> Congress to conclude that the legislative purpose of
> rewarding domestic producers who supported
> antidumping petitions . . . would be 'more fully
> effectuated' if the petition support requirement were
> applied both prospectively and retroactively."

*Pat Huval*, 823 F. Supp. 2d at 1377(JA0011), quoting *New Hampshire Ball Bearing,* 815 F. Supp. 2d at 1306-10 (quoting *Pension Benefit,* 467 U.S. at 730-31).

The Supreme Court has recognized that retroactive application of statutes "often serve entirely benign and legitimate purposes," including the purpose of giving "comprehensive effect to a new law Congress considers salutary." *Landgraf*, 511 U.S. at 267-68. *See also Pension Benefit*, 467 U.S. at 730 ("it was eminently rational for Congress to conclude that the purposes of the MPPAA could be more fully effectuated if its withdrawal liability provisions were applied retroactively"). The retroactive application of the CDSOA's petition-support requirement fits precisely this "benign and legitimate" mold by giving "comprehensive effect" to a "salutary" statute.

In *Pat Huval*, the Trade Court held that the retroactive application of the CDSOA's petition-support requirement did not violate Due Process guarantees because it was justified by a rational legislative purpose. *See Pat Huval*, 823 F. Supp. 2d at 1377 (JA0011). In *Pat Huval*, the Trade Court cited to and relied upon its earlier decision in *New Hampshire Ball Bearing,* where it held:

31

The Court of Appeals previously concluded that "the purpose of the Byrd Amendment's limitation of eligible recipients was to reward injured parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings," *SKF USA II,* 556 F.3d at 1352, and that "the Byrd Amendment is rationally related to the government's legitimate purpose of rewarding parties who promote the government's policy against dumping," *id.* at 1360. * * * Because Plaintiff specifically attacks the CDSOA on due process retroactivity grounds, we consider whether "the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit,* 467 U.S. at 730, 104 S.Ct. 2709. We conclude that it is.

It was not arbitrary or irrational for Congress to conclude that the legislative purpose of rewarding domestic producers who supported antidumping petitions, *i.e.,* the very legislative purpose the Court of Appeals recognized, would be "more fully effectuated" if the petition support requirement were applied both prospectively and retroactively. *See Pension Benefit,* 467 U.S. at 730-31, 104 S.Ct. 2709. By doing so, Congress provided monetary rewards, in the form of reimbursed expenses, not only to domestic producers expressing support for petitions in future antidumping investigations but also to those domestic producers who supported past antidumping petitions that ripened into antidumping duty orders and who continue to produce goods competing with imported merchandise subject to those orders. By applying the CDSOA to the approximately 350 antidumping and countervailing duty orders in effect before CDSOA enactment, rather than only to those orders issued afterwards, Congress provided a reward mechanism that was considerably more comprehensive than one based only on a prospective scheme. * * *

The court concludes that the retroactive reach of the petition support requirement in the CDSOA is justified by a rational legislative purpose and therefore is not

> vulnerable to attack on constitutional due process
> grounds.

*New Hampshire Ball Bearing,* 815 F. Supp. 2d at 1309.[11]

This Court has determined that the legislative purpose of the CDSOA was to reward parties that assist the government's enforcement of the antidumping law. That purpose is comprehensively and most effectually served by rewarding all of those domestic producers who assisted government enforcement of the antidumping law through litigation support activities (*i.e.*, petitioning or supporting a petition and investigation), whether or not the CDSOA was in place when they provided that assistance and support. By applying the CDSOA to all existing orders, regardless of when they were issued, Congress determined to reward, on an equal basis, all domestic companies that (1) assisted the government in enforcing the antidumping law by supporting a petition that resulted in an order, and (2) "continued" to be subject to the injurious impact of dumping in spite of the imposition of the existing antidumping duty order. This is an eminently rational justification for retroactively applying the petition-support requirement of the CDSOA to all existing pre-enactment orders (as well as prospectively to post-enactment orders). And, this justification is wholly consistent with the purpose of

---

[11] The Trade Court reached similar determinations in the following decisions: *Schaeffler Group USA,* 808 F. Supp. 2d at 1363-64; *NSK Corp.*, 821 F. Supp. 2d at 1357-58; *United Synthetics,* 844 F. Supp. 2d at 1321-23; *Koyo Corp of U.S.A.,* 899 F. Supp. 2d at 1372.

the CDSOA discerned by this Court in *SKF*—to reward only "parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings." *SKF*, 556 F.3d at 1352.

SKF and JTEKT correctly note that "the purpose of the petition support requirement was to reward parties that assisted government enforcement of the trade laws." SKT-JTEKT Brief at 20. But then, SKF and JTEKT, incorrectly and critically, misstate the purpose when they assert in the very next sentence that the "legislative purpose" was "incentivizing litigation support activities that aid enforcement of the trade laws," which they claim only relates to post-enactment orders. *Id.* (emphasis added). Rewarding and incentivizing are not the same things. For example, if an organization creates a new "lifetime achievement award" and presents it to someone who had no reason to believe such an award would ever exist, it has rewarded that person without ever having incentivized that person (and rationally so). A "reward" is a form of recompense for past action, while an "incentive" is something meant to stimulate future action. A desire to reward is entirely legitimate and rational, and has a different scope than a desire to incentivize.

SKF and JTEKT focus on the wrong purpose. The legislative purpose of the CDSOA recognized by this Court was to reward, not incentivize. As such, that purpose is served by rewarding those who assisted government enforcement of the

antidumping law, and supported a petition and investigation, whether or not the CDSOA was in place when they provided that assistance and support. This purpose has nothing to do with incentives, and all to do with rewarding conduct that supported enforcement of the antidumping law.

Indeed, if the statute's purpose is to reward, there is no reason for Congress to provide a reward only to domestic producers who support future petitions but to deny the same reward to domestic producers who supported petitions resulting in orders already in existence when the CDSOA was enacted. The reward is only operative where dumping continues after an order is issued; it is not a benefit that flows automatically from an antidumping duty order. Hence, even for preexisting AD orders, if dumping continued after CDSOA enactment, it was reasonable for Congress to determine that those domestic producers who supported petitions related to those preexisting orders should also be rewarded for supporting successful petitions and enforcement of the trade laws.

It was hardly arbitrary for Congress to reward all supporters of successful petitions – whether relating to existing orders or to future orders. Indeed, it would have been arbitrary for Congress to reward one group but to deny the other, and it would have been irrational for Congress to so discriminate when the purpose of the statute is to reward support for the government's enforcement of the trade laws. And, as the Trade Court found, it was reasonable for Congress to believe that the

remedial function of the statute would be more fully effectuated if it applied to all assessments made after the CDSOA was enacted, regardless of when the order was issued.

In sum, because the legitimate legislative purpose of the CDSOA found in *SKF* equally supports both pre-enactment and post-enactment antidumping orders, this purpose satisfies the Due Process test for retroactive application of legislation. Accordingly, the Court should find that the retroactive application of the CDSOA's petition-support requirement does not violate the Due Process Clause.

### 2. *SKF's and JTEKT's arguments are unavailing.*

SKF and JTEKT offer a number of reasons why the retroactive application of the CDSOA's petition-support requirement is irrational. All of these arguments are unavailing.

First, SKF and JTEKT argue that the retroactive application of the statute is irrational because it upset their settled expectations and does not serve the legislative purpose. They state that, given the retroactive application of the CDSOA, a court must consider whether SKF and JTEKT "could have anticipated the potential liability attached to its chosen conduct and avoided the liability by altering its conduct." SKF-JTEKT Brief at 19.[12] They further claim that it is not

---

[12] In support of this assertion, SKF and JTEKT cite *Mojica v. Reno*, 970 F. Supp. 130, 170 (E.D.N.Y. 1997). *Mojica*, however, concerned a statute that, unlike

rational for Congress to reward "speech and conduct that occurred prior to the enactment of the CDSOA" because it will not further the "legislative purpose – *i.e.*, <u>incentivizing</u> litigation support activities that aid enforcement of the trade laws" which is "only rationally related to post-enactment orders where domestic producers had notice of the CDSOA's provisions." SKF-JTEKT Brief at 19-20 (emphasis added). They claim that, given the statute's "goal of motivating compliance with governmental policy," this "incentivizing" purpose is furthered only if domestic parties have "prior notice" (*i.e.*, their settled expectations are not disturbed) of possible CDSOA distributions. SKF-JTEKT Brief at 20.

These arguments are unconvincing. SKF's and JTEKT's fundamental error is misstating the legislative purpose. As reviewed above, the legislative purpose of the CDSOA recognized by this Court was to <u>reward</u> domestic producers for initiating or supporting successful trade proceedings, <u>not to incentivize</u> litigation support or to motivate compliance with trade laws. A "reward" is equally applicable to past as well as to future conduct, while an incentive only looks forward to future conduct.

---

the CDSOA, did not have clear instructions regarding its retroactive reach. *See Mojica,* 970 F. Supp. at 168 ("With [the statute], Congress expressed no clear intent favoring retroactivity ….").

As to the possible upsetting of settled expectations[13] by the CDSOA, and the
unforeseeability and lack of notice of changes to the law, none of these arguments
provide a sound basis for finding a due process violation.  See, for example:

> The core of defendants' argument is that the legislation is
> unconstitutional because it changed their expectations
> about the extent of their liability in this case.  However,
> this reason alone is an insufficient basis to strike down
> the law as unconstitutional.  Indeed, defendants'
> argument is framed in precisely the terms adumbrated by
> the Supreme Court when it held that "readjusting rights
> and burdens is not unlawful solely because it upsets
> otherwise settled expectations."  *Pension Benefit
> Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729,
> 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984) (citations
> omitted).  Defendants are bound to show that the 1992
> Amendment to FEPA lacked a legitimate legislative
> purpose, but the only one they offer is that it disturbed
> their expectations.  Such an argument fails to
> demonstrate unconstitutionality under *Pension Benefit
> Guaranty.*

---

[13] In arguing that the CDSOA affected their settled expectations and reliance on
existing legal rules, SKF and JTEKT assert that, if they had anticipated the
CDSOA's "altering of the law," "they likely would have had no choice but to
express support for the antidumping petition."  SKF-JTEKT Brief at 14.  This
assertion is improbable.  They point to no example since the CDSOA's
enactment of a domestic producer owned by a foreign producer alleged to be
dumping who supported a petition.  Indeed, as this Court pointed out in *SKF*,
the interests of a domestic producer allied with a foreign-producer dumper is in
defeating the petition, not in supporting the petition and hoping that it will
receive CDSOA distributions when dumping continues.  *See SKF,* 556 F.3d at
1358 ("Opposing parties' interests lie in defeating the petition, typically (as is
the case here) because the domestic industry participant is owned by a foreign
company charged with dumping.").

*Lieberman-Sack v. HCHP-NE*, 882 F. Supp. 249, 255 (D.R.I. 1995) (emphasis added).

> [P]laintiffs cite no authority indicating that foreseeability is a due process requirement for retroactive legislation; thus we have searched only for a rational basis. In the same vein is plaintiffs' argument that the Coal Act upsets their settled expectations and therefore offends due process. Even assuming the statute upset their expectations, the Supreme Court has said that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations," and "[t]his is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Turner Elkhorn,* 428 U.S. at 15-16, 96 S.Ct. at 2892-2893.

*Davon,* 75 F. 3d at 1127.

> Plaintiffs further argue that lack of timely notice of impending liability under the Coal Act violates due process. This is nothing more than their unforeseeability and settled-expectations arguments combined. They offer no authority, and we have uncovered none, that timely notice is a due process requirement for retroactive economic legislation.

*Davon,* 75 F. 3d at 1127 n. 10.

SKF and JTEKT next argue that the retroactive application of the CDSOA is irrational because "not all parties that qualify as ADPs receive distributions" due to the fact that "no funds are available" for some orders. SKF-JTEKT Brief at 21. SKF and JTEKT claim that this fact shows that the statute is not rationally related to the purpose of "rewarding litigation support activities." *Id.* But, this argument

does not show that the statute is irrational. As pointed out above, the CDSOA "reward" in the form of duty distributions is only operative where dumping continues after an order is issued; it is not a benefit that flows automatically from an antidumping duty order. The lack of funds available for certain orders simply means that dumping has not continued for the covered products, and that the order is therefore effectively eliminating unfair import pricing for those products.

SKF and JTEKT also argue that the CDSOA is a "means of retribution" against companies that oppose petitions because the CDSOA's "successor provisions deny any and all CDSOA disbursements, *ad infinitum*, to any company that opposed a petition." SKF-JTEKT Brief at 21. Initially, it should be noted that SKF and JTEKT are here basing this argument on a provision of the CDSOA (the acquisition provision in 19 U.S.C. § 1675c(b)(1)) that has not been applied to them, while the basis of their due process claim is a challenge to the retroactive application of the CDSOA's petition-support requirement, which has been applied to them. In any event, their "means of retribution" argument is without merit. While courts have noted that the possibility of retribution may be a concern in retroactive statutes, that concern is resolved by the legislature's clear intent.

> The strongest protection that federal courts give to those concerns [*e.g.*, retribution], however, is a requirement that Congress manifest the retroactive nature of legislation with "clear intent." *Id.* [*Landgraf*, 511 U.S.] at 272, 114 S.Ct. 1483. "[A] requirement that Congress first make its intention clear helps ensure that Congress

40

> itself has determined that the benefits of retroactivity
> outweigh the potential for disruption or unfairness." *Id.*
> at 268, 114 S.Ct. 1483; *see also id.* at 272-73, 114 S.Ct.
> 1483 ("Requiring clear intent assures that Congress itself
> has affirmatively considered the potential unfairness of
> retroactive application and determined that it is an
> acceptable price to pay for the countervailing benefits.").
> "Such a requirement allocates to Congress responsibility
> for fundamental policy judgments concerning the proper
> temporal reach of statutes, and has the additional virtue
> of giving legislators a predictable background rule
> against which to legislate." *Id.* at 273, 114 S.Ct. 1483.

*Ileto v. Glock, Inc.*, 565 F.3d 1126, 1138 (9th Cir. 2009). Moreover, this Court has

repeatedly rejected the argument that the CDSOA is penal. *See SKF,* 556 F.3d at

1350, n.21, 1351-52; *Huaiyin,* 322 F.3d at 1380.

Finally, SKF and JTEKT argue that "the retroactive effect of the CDSOA is

equally offensive to the Due Process Clause because of its severity," by which they

mean the length of the statute's temporal reach (*i.e.*, SKF's and JTEKT's eligibility

"based on speech occurring over 20 years ago"). SKF-JTEKT Brief at 22. This

argument lacks merit.

SKF and JTEKT cite only one authority in support of their argument -

*Eastern Enterprises v. Apfel*, 524 U.S. 498, 549 (1998) (plurality opinion). The

value of that case as due process precedent is doubtful. *Eastern Enterprises* was

decided by a divided court and the plurality decided the case on the basis of the

Takings Clause, not the Due Process Clause. This Court has noted of *Eastern

Enterprises*:

41

> The District of Columbia Circuit has concluded that the plurality and concurrence in *Eastern Enterprises* cannot be combined into a single holding on the Due Process issue. *Ass'n of Bituminous Contractors v. Apfel,* 156 F.3d 1246, 1254-55 (D.C.Cir.1998) ("Justice Kennedy's concurrence in the judgment is of no help in appellant's efforts to cobble together a due process holding from *Eastern Enterprises'* fragmented parts.... Justice Kennedy's due process reasoning can in no sense be thought a logical subset of the plurality's takings analysis.").

*Commonwealth Edison*, 271 F.3d at 1343 n.14.

The length of time that a retroactive statute reaches back is not determinative of a due process violation. The Seventh Circuit has noted that "there is no support for the proposition that the degree of retroactivity itself violates the Due Process Clause." *Davon,* 75 F. 3d at 1126, citing *In re Chateaugay Corp.*, 53 F.3d 478, 491(2d Cir. 1995). The *Chateaugay* court said: "The proposition that the Due Process Clause imposes a time limit on a law's retrospective effect elicits no support from the case law." 53 F.3d at 491. Thus, "Congress can make a statute retroactive for as long a period as is rational." *Davon,* 75 F. 3d at 1126. SKF and JTEKT fail to show that the degree of retroactivity as applied to them by the CDSOA is irrational.[14]

---

[14] Indeed, SKF and JTEKT fail to show why a 12-year period of retroactivity in this case, during which time dumping continued, is "unreasonable", or is in any way comparable to the rare example of the 30-50 year "severe retroactive liability" at issue in *Eastern Enterprises* (524 U.S. at 528). Compare *General Motors Corp. v.*

In sum, SKF and JTEKT have not met their burden to establish a due process violation – they have failed to show that, in enacting the retroactive reach of the CDSOA's petition-support requirement, Congress has acted in an arbitrary and irrational way.  Hence, SKF's and JTEKT's due process claim must be rejected.

### C.    SKF's And JTEKT's Reliance On *Landgraf* Is Inapposite.

SKF and JTEKT engage in a long discussion attempting to show that the CDSOA is a statute that has "retroactive effects."  *See* SKF-JTEKT Brief at 11-18. In doing so, they cite *Landgraf v. USI Film Products*, 511 U.S. 244 (1994).  *See, e.g.,* SKF-JTEKT Brief at 12.  Yet, *Landgraf* is a case that has nothing whatsoever to do with the test for invalidating legislation under the Due Process Clause.  SKF and JTEKT also invoke *Republic of Austria v. Altmann*, 541 U.S. 677 (2004) (*see* SKF-JTEKT Brief at 13-14), but that case likewise concerns discerning Congress's retroactive intent from statutory interpretation rather than the constitutional test for impermissibly retroactive legislation.

SKF's and JTEKT's due process argument appears to be largely in support of a <u>statutory</u> claim that the CDSOA is impermissibly retroactive.  But, SKF and

---

*Romein*, 503 U.S. 181, 191-92 (1992) (6-year period of retroactivity does not violate due process); *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.,* 999 F. Supp. 1153, 1165 (N.D. Ill. 1998) (16-22 year period of retroactivity does not violate due process).

JTEKT are challenging the CDSOA on constitutional, not statutory, grounds—they assert that the retroactive application of the CDSOA's petition-support requirement violates the due process guarantees of the Fifth Amendment. SKF and JTEKT appear to be trying to reinvent the constitutional test or trying to prove points that are not disputed. For example, they insist that "[t]he Constitution recognizes a strong distrust of laws with retroactive effect" (SKF-JTEKT Brief at 12), but it is settled – for purposes of a Due Process challenge – that all that is required to sustain legislation against a claim of impermissible retroactivity is "a legitimate legislative purpose furthered by rational means." *Romein*, 503 U.S. at 191. SKF and JTEKT have confused the standards for reviewing a constitutional claim against retroactive legislation with the standards applicable to a statutory claim against retroactivity. Thus, SKF's and JTEKT's due process argument fails to distinguish between precedents that address whether a statute will be construed to have retroactive effect (a statutory challenge) and precedents that address whether a statute's retroactive application is constitutionally impermissible.[15]

---

[15]   In addition, SKF and JTEKT rely, over and over again, on the very same arguments that underlie their failed First Amendment challenges. For example:

> [B]efore enactment of the CDSOA, the antidumping law did not burden domestic producers' speech.

SKF-JTEKT Brief at 13 (emphasis added).

Relying on *Landgraf,* SKF and JTEKT assert that a court must examine three factors to determine whether a statute is retroactive: (1) the "nature and extent of the change of the law"; (2) "the degree of connection between the operation of the new rule and a relevant past event"; and (3) "considerations of fair notice, reasonable reliance, and settled expectations." *See* SKF-JTEKT Brief at 16-17, citing *Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1362-63 (Fed. Cir. 2005) [16] (quoting *Landgraf*, 511 U.S. at 270). SKF and JTEKT claim that an analysis of the CDSOA under these factors shows that the CDSOA created impermissible retroactive effects.[17] *See* SKF-JTEKT Brief at 17.

---

> SKF USA and JTEKT could not have anticipated … that the government would fundamentally alter the companies' <u>speech rights</u> ….

SKF-JTEKT Brief at 13 (emphasis added).

> [The retroactive application of CDSOA is] denying a benefit to SKF USA and JTEKT based on <u>speech</u> ….

SKF-JTEKT Brief at 22 (emphasis added). But, those issues were decided by this Court in *SKF*. By repeatedly resurrecting these issues, SKF and JTEKT show that their Due Process challenge is simply a repackaged version of their failed First Amendment arguments.

[16] In *Princess Cruises,* this Court considered the *Landgraf* factors to answer non-constitutional questions about whether Customs had authority to impose certain tax liability regarding prior conduct. *Landgraf* concerned whether a statute should be read to apply to certain cases. Neither *Princess Cruises* nor *Landgraf* involved a constitutional attack on a statute.

[17] Even if the *Landgraf* factors were relevant to the constitutional question presented here, which they are not, the CDSOA does not have a "retroactive

effect" in the sense in which that term is defined by *Landgraf.  See Landgraf*, 511 U.S. at 280 ("retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed").

The CDSOA did not affect SKF or JTEKT by imposing any new legal consequences or liabilities, impairing any vested right, or creating any new obligation, duty, or disability.  As explained above, the CDSOA did not substantively change the antidumping law.

Even in *Landgraf*, the Supreme Court recognized that a statute "is not made retroactive merely because it draws upon antecedent facts for its operation." *Landgraf,* 511 U.S. at 270 n.24, quoting *Cox* v. *Hart,* 260 U.S. 427, 435 (1922).

Whether a new statute has a "significant connection with past events" "'depends upon whether the conduct that allegedly triggers the statute's application occurred before or after the law's effective date.'"  *Travenol Labs., Inc. v. United States,* 118 F.3d 749, 752 (Fed. Cir. 1997), quoting *McAndrews v. Fleet Bank of Mass., N.A*., 989 F.2d 13, 16 (1st Cir. 1993).  Here, neither SKF's nor JTEKT's pre-enactment opposition to the petition triggered application of the CDSOA.  Nor did the existence of the pre-enactment antifriction bearings orders themselves trigger the CDSOA's application.  Rather, application of the statute to SKF and JTEKT was triggered when they filed, post-enactment, their requests for CDSOA distributions for a particular fiscal year.

The CDSOA only applied to duties assessed on or after October 1, 2000.  *See* 19 U.S.C. § 1675c (note).  The CDSOA's petition-support requirement only determined SKF's and JTEKT's status for purposes of their eligibility for distributions of duties assessed after CDSOA enactment.  Thus, under a *Landgraf* analysis, because the CDSOA affected only duties assessed after enactment, its primary effect was prospective, not retroactive.

As for considerations of fair notice, reasonable reliance, and settled expectations, those *Landgraf* factors are not pertinent because SKF and JTEKT have failed to identify a protected interest.  *See supra.*  Moreover, even if SKF and JTEKT had "settled expectations" upset by the CDSOA, the case law is "'clear that legislation readjusting rights and burdens is not unlawful solely

Even if SKF and JTEKT were correct in this assertion, however, it would be of no moment.  The relevant question presented here is not whether the CDSOA has "retroactive effects" but whether the statute's clearly stated temporal reach is *constitutionally permissible* because it is supported by a legitimate legislative purpose.  SKF's and JTEKT's reliance on the *Landgraf* analysis is thus wholly misplaced because it does not address the relevant question.

*Landgraf* concerned whether the instructions of a new statute, in the absence of express direction in the statute regarding its temporal reach, should be given effect with regard to events that preceded the enactment of the statute. [18]  *Landgraf*

---

because it upsets otherwise settled expectations.'"  *Pension Benefit,* 467 U.S. at 729, quoting *Turner Elkhorn,* 428 U.S. at 15-16.

[18]  In the words of the Supreme Court:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.  If Congress has done so, of course, there is no need to resort to judicial default rules.  When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.  If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.  Except in the context of criminal legislation, the presumption against retroactive application of new statutory law is a presumption only, which is overcome, *inter alia*, by the statute's instruction to the contrary.

*Landgraf*, 511 U.S. at 280.

did not even remotely address whether a statute was constitutionally defective because it was impermissibly retroactive in its reach.  Hence, *Landgraf* and its factors is not a guide to whether a retroactively applied statute violates constitutional due process.

Indeed, other courts have recognized that *Landgraf*, although not infrequently cited in support of a due process argument, is irrelevant to that purpose.  For example, the Eleventh Circuit explained:

> Mohammed contends that applying the amended definition of aggravated felony to a conviction that pre-dates IIRIRA's effective date, thereby making him ineligible to seek discretionary relief from removal, violates his rights under the Due Process Clause of the Fifth Amendment.  In making this argument, Mohammed relies extensively on the Supreme Court's opinion in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). <u>Technically speaking, however, *Landgraf* does not purport to lay down rules for deciding when retroactive application of a statute would violate Due Process</u>.  Rather, the Supreme Court in that case established principles to be used by courts in evaluating whether, as a matter of statutory analysis, an Act of Congress may be applied retroactively.  Although the Court did discuss potential Due Process considerations as one reason to adhere to the general presumption against a statute's retroactivity in the absence of clear Congressional intent to the contrary, *see id.* at 266, 114 S.Ct. at 1497, the Court did not attempt to define precisely when retroactive application of a statute would violate Due Process. *** *Landgraf,* therefore, does not fully address the constitutional objection raised by Mohammed.

*Mohammed v. Ashcroft*, 261 F.3d 1244, 1248-49 (11th Cir. 2001) (citation omitted)

(emphasis added).  In the same vein, the Fifth Circuit said:

> Although there is language in the Supreme Court's
> seminal decision in *Landgraf v. USI Film Products,* 511
> U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994),
> indicating that retroactive application of the law can
> implicate legitimate due process concerns, constitutional
> due process was not the ground relied upon by the court
> in that case.

*Falek v. Gonzales*, 475 F.3d 285, 290 (5th Cir. 2007).  *See also Hamama v. INS*, 78

F.3d 233, 236 (6th Cir. 1996) ("*Landgraf* involved statutory interpretation, not

constitutional scrutiny").

The CDSOA expressly applies to all orders "in effect on January 1, 1999."  19

U.S.C. § 1675c(d)(1).  Given this clear instruction as to the CDSOA's temporal reach,

there is no basis for a *Landgraf* analysis of the statute.  *See Landgraf,* 511 U.S. at 280

(if Congress's temporal reach instructions are clear, "there is no need to resort to

judicial default rules"); *see also Madrid v. Gomez*, 940 F. Supp. 247, 249 (N.D. Cal.

1996) ("[C]ourts must first determine 'whether Congress has expressly prescribed

the statute's proper reach.'  *Landgraf,* 511 U.S. at [280], 114 S.Ct. at 1505.  If so,

that ends the matter and we follow Congressional command (assuming such

command does not itself violate the Constitution).").

Moreover, SKF and JTEKT do not contest that the CDSOA's temporal-reach

instructions encompass SKF's and JTEKT's pre-enactment conduct opposing the

antidumping petitions, and that the statute's petition-support requirement thus makes them ineligible for distributions. Rather, they acknowledge that it does. *See* SKF-JTEKT Brief at 12 ("The CDSOA as applied to SKF USA and JTEKT [bases] their eligibility for CDSOA disbursements … on conduct (i.e., a failure to express support for the AFB petition) occurring prior to enactment of the CDSOA."). Thus, SKF and JTEKT do not raise the type of <u>statutory</u> interpretation issue that was resolved in *Landgraf*. Instead, SKF and JTEKT argue that the CDSOA's temporal reach instruction (while clear) violates their constitutional due process rights because the petition-support requirement lacks a rational basis when applied to pre-enactment orders. *See* SKF-JTEKT Brief at 12 ("the CDSOA as applied to SKF USA and JTEKT is a violation of the Due Process Clause of the Fifth Amendment to the Constitution"), and 20 ("To reward pre-enactment litigation support activities would be gratuitous and unrelated to the goal of motivating compliance with governmental policy."). As shown above, however, SKF's and JTEKT's due process argument fails because the statute's retroactive reach is supported by a rational legislative purpose.

### III.    SKF'S AND JTEKT'S CLAIMS FOR FISCAL YEAR 2004, AND JTEKT'S CLAIMS FOR FISCAL YEAR 2006 IN CIT CT NO. 08-00340, ARE BARRED BY THE TWO-YEAR STATUTE OF LIMITATIONS.

SKF and JTEKT raise several contingent claims with respect to statute-of-limitations issues which are relevant only if their due process claims succeed. *See* SKF-JTEKT Brief at 3 ("… if successful as to the Due Process claims, they [i.e., SKF and JTEKT] challenge the CIT's statute of limitations decision for each Plaintiff-Appellant.").

### A.    SKF's FY 2004 Claim (CIT Ct. No. 06-00328)

SKF argues that the Trade Court erred in dismissing SKF's complaint regarding fiscal year 2004 distributions (CIT Ct. No. 06-00328) for lack of jurisdiction because the complaint was untimely filed outside of the two-year statute of limitations period. SKF-JTEKT Brief at 22-26. Although SKF does not dispute that Customs' June 2, 2004 Federal Register notice may have been the *earliest* date that its cause of action could have accrued, SKF argues that the continuing violation doctrine applies. SKF-JTEKT Brief at 24-25.

The two-year statutory period of limitations runs from the time a cause of action "first accrues." *See* 28 U.S.C. § 2636(i). As to its FY 2004 claim, SKF had a "complete and present cause of action" when Customs published its notice of intent to distribute duties under the Byrd Amendment for fiscal year 2004, because at that time SKF knew that funds were available for distribution and knew whether

51

it had qualifying expenditures. *SKF*, 556 F.3d at 1349. Thus, unless the continuing violation doctrine applies, the statute of limitation ran from the time of the publication of the notice, and SKF's FY 2004 claim is time barred, as the Trade Court correctly held, because SKF filed its complaint more than two years later. SKF, however, does not show why the continuing violation doctrine should apply here. SKF argues that it suffered harm when Customs published its notice, and then again when duties were distributed. SKF-JTEKT at 24, n. 3. But, the continuing violation doctrine does not apply to continuing effects. *See, Brown Park Estates-Fairfield Development v. United States*, 127 F.3d 1449, 1456-57 (Fed. Cir.1997) (discussing case law). Thus, the Court should reject SKF's argument and affirm the decision of the Trade Court.

### B.    JTEKT's FY 2004 Claim (CIT Ct. No. 06-00324)

JTEKT argues that, for the same reasons stated by SKF above, its claims for CDSOA distributions for FY 2004 should not be barred by the statute of limitations. SKF-JTEKT Brief at 26. JTEKT is wrong.[19]

---

[19] The Court need not address this issue. The Trade Court did not make a ruling on the FY 2004 claims (if any) by JTEKT in CIT Ct. No. 06-00324. *See Pat Huval*, 823 F. Supp. 2d at 1373-74 (JA0008-0009). This Court has said:

> [I]t is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Our precedent generally counsels against entertaining arguments not presented to the district court.

The JTEKT complaint covering claims for FY 2004 is CIT Ct. No. 06-00324. That complaint was filed on September 25, 2006. *See Pat Huval*, 823 F. Supp. 2d at 1369 n.2 (JA0004-0005). As discussed in *SKF,* JTEKT's CDSOA claims for FY 2004 first accrued on June 2, 2004, the date that Customs published its notice of intent to distribute CDSOA offsets. *See Distribution of Continued Dumping and Subsidy Offsets to Affected Domestic Producers,* 69 Fed. Reg. 31162 (June 2, 2004). Thus, JTEKT's complaint in CIT Ct. No. 06-00324 was filed more than two years after June 2, 2004, the date JTEKT's cause of action first accrued. For the same reasons explained above with respect to SKF's claim, JTEKT's 2004

---

*Golden Bridge Tech., Inc. v. Nokia*, Inc., 527 F.3d 1318, 1322-23 (Fed. Cir. 2008).

JTEKT's complaint did not specifically challenge distributions for FY 2004. FRCP 8(a) requires a complaint to contain a "short and plain statement of the grounds for the court's jurisdiction," and a "short and plain statement of the claim." JTEKT's complaint in CIT Ct. No. 06-00324, however, does not identify FY "2004" as a subject of the complaint, does not state that the complaint is challenging CDSOA distributions for FY "2004," and does not assert grounds for the court's jurisdiction of FY "2004" distributions. *See* Koyo Corporation of U.S.A. Amended Complaint, ECF No. 145 filed in Cons. Ct. No. 06-00290 (JA0059-0092).

However, if the Court should consider this issue, it is readily apparent, as explained above, that if JTEKT's complaint in CIT Ct. No. 06-00324 is believed to encompass claims for FY 2004, those claims were untimely because they were filed more than two years after the cause of action first accrued. *See*, Timken Supplemental and Amended Answer, ECF No. 212 filed in Cons. Ct. No. 06-00290, para. 20 (JA0093-0110, JA0100).

claims are therefore barred by the statute of limitations as interpreted by this Court in *SKF*.

### C.    JTEKT's FY 2006 Claim (CIT Ct. No. 08-00340)

In *Pat Huval*, Timken argued that JTEKT's CDSOA claims for FY 2006 made in CIT Ct. No. 08-00340 were, under this Court's decision in *SKF,* untimely.

> Timken argues that the action Koyo commenced on September 30, 2008 (Compl. 5; prior to consolidation, Court No. 08-00340), is untimely to the extent Koyo seeks to obtain a CDSOA distribution for Fiscal Year 2006 ("Koyo's 2006 Challenge").

*Pat Huval,* 823 F. Supp. 2d at 1373 (JA0008).  The Trade Court agreed and dismissed JTEKT's FY 2006 claims in CIT Ct. No. 08-00340 because that complaint was filed more than two years after JTEKT's FY 2006 cause of action first accrued.

> The 2006 notice of intent to distribute was published on June 1, 2006. *Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers,* 71 Fed. Reg. 31,336 (June 1, 2006). Koyo did not file its lawsuit challenging this distribution until more than two years later, on September 30, 2008. (Compl. 5.)  * * * We conclude, therefore, that … Koyo's 2006 Challenge first accrued on the respective date[] of publication of the … notice[] [of intent to distribute].

*Pat Huval,* 823 F. Supp. 2d at 1374 (JA0008-0009).  The Trade Court, accordingly, dismissed JTEKT's "2006 Challenge" in CIT Ct. No. 08-00340 for lack of jurisdiction.  *Id.*  For all the same reasons outlined above with respect to SKF's and

JTEKT's FY 2004 claims, the Trade Court's dismissal, in compliance with this Court's binding decision in *SKF,* was clearly correct and should be affirmed.[20]

## CONCLUSION

For the foregoing reasons, the Court should reject SKF's and JTEKT's Due Process challenge to the retroactive application of the CDSOA's petition-support requirement. The Court should affirm the Trade Court's decision that the retroactive application of the CDSOA's petition-support requirement is supported by a legitimate legislative purpose, and therefore does not violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

Should the Court reach the contingent claims of the statute of limitations, the Court should affirm the Trade Court's decision that SKF's and JTEKT's claims for fiscal year 2004, and JTEKT's claims for fiscal year 2006 in CIT Ct. No. 08-

---

[20] JTEKT argues that it also challenged CDSOA distributions for FY 2006 in CIT Ct. Nos. 06-00324. SKF-JTEKT Brief at 26. But, Timken did not challenge the timeliness of JTEKT's FY 2006 claim in CIT Ct. No. 06-00324, and the Trade Court did not make any ruling on the timeliness of JTEKT's FY 2006 claim in CIT Ct. No. 06-00324. The Trade Court ruled only that JTEKT's FY 2006 claim as filed in CIT Ct. No. 08-00340 was untimely. *See Pat Huval*, 823 F. Supp. 2d at 1373 (JA0008), where the Trade Court makes clear that the term "Koyo's 2006 Challenge" refers only to CIT Ct. No. 08-00340. Thus, when the Trade Court determined that "Koyo's 2006 Challenge" was "barred by the two year statute of limitations" (*Pat Huval*, 823 F. Supp. 2d at 1374) (JA0008), that ruling applied only to JTEKT's FY 2006 claim as stated in CIT Ct. No. 08-00340.

00340, were untimely filed, and therefore are barred by the two-year statute of

limitations.

Respectfully submitted,

*/s/ Terence P. Stewart*

Terence P. Stewart
Geert De Prest
Patrick J. McDonough
STEWART AND STEWART
2100 M Street, N.W.
Washington, D.C. 20037
(202) 785-4185
tstewart@stewartlaw.com

*Special Counsel for Defendants-Appellees*
October 10, 2014                    *The Timken Company and MPB Corporation*

# EXHIBIT 1

**(B) Exception**

If the administering authority determines that the interested party who requested an investigation under this section is a related party or an importer within the meaning of section 1677(4)(B) of this title, the administering authority may decline a request by such party to initiate a review of an order under section 1675(c) of this title which involves the same or comparable subject merchandise.

**(2) Cumulation**

If a review under section 1675(c) of this title is initiated under paragraph (1), such review shall be treated as having been initiated on the same day as the investigation under this section, and the Commission may, in accordance with section 1677(7)(G) of this title, cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which such investigations are treated as initiated on the same day.

**(3) Time and procedure for Commission determination**

The Commission shall render its determination in the investigation conducted under this section at the same time as the Commission's determination is made in the review under section 1675(c) of this title that is initiated pursuant to this subsection. The Commission shall in all other respects apply the procedures and standards set forth in section 1675(c) of this title to such section 1675(c) of this title reviews.

(June 17, 1930, ch. 497, title VII, §753, as added Pub. L. 103–465, title II, §271(a), Dec. 8, 1994, 108 Stat. 4918; amended Pub. L. 104–295, §39, Oct. 11, 1996, 110 Stat. 3540.)

References in Text

Section 1303 of this title, referred to in subsecs. (a)(2) and (c), is defined in section 1677(26) of this title to mean section 1330 as in effect on the day before Jan. 1, 1995.

Amendments

1996—Pub. L. 104–295, §39(1), inserted "or section 1671(c)" after "section 1303" in section catchline.

Subsecs. (a)(2), (c). Pub. L. 104–295 inserted "or section 1671(c) of this title" after "section 1303 of this title" and struck out "under section 1303(a)(2) of this title" after "material injury".

Effective Date

Section effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as an Effective Date of 1994 Amendment note under section 1671 of this title.

Uruguay Round Agreements: Entry Into Force

The Uruguay Round Agreements, including the World Trade Organization Agreement and agreements annexed to that Agreement, as referred to in section 3511(d) of this title, entered into force with respect to the United States on Jan. 1, 1995. See note set out under section 3511 of this title.

## § 1675c. Continued dumping and subsidy offset

**(a) In general**

Duties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures. Such distribution shall be known as the "continued dumping and subsidy offset".

**(b) Definitions**

As used in this section:

**(1) Affected domestic producer**

The term "affected domestic producer" means any manufacturer, producer, farmer, rancher, or worker representative (including associations of such persons) that—

(A) was a petitioner or interested party in support of the petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and

(B) remains in operation.

Companies, businesses, or persons that have ceased the production of the product covered by the order or finding or who have been acquired by a company or business that is related to a company that opposed the investigation shall not be an affected domestic producer.

**(2) Commissioner**

The term "Commissioner" means the Commissioner of Customs.

**(3) Commission**

The term "Commission" means the United States International Trade Commission.

**(4) Qualifying expenditure**

The term "qualifying expenditure" means an expenditure incurred after the issuance of the antidumping duty finding or order or countervailing duty order in any of the following categories:

(A) Manufacturing facilities.
(B) Equipment.
(C) Research and development.
(D) Personnel training.
(E) Acquisition of technology.
(F) Health care benefits to employees paid for by the employer.
(G) Pension benefits to employees paid for by the employer.
(H) Environmental equipment, training, or technology.
(I) Acquisition of raw materials and other inputs.
(J) Working capital or other funds needed to maintain production.

**(5) Related to**

A company, business, or person shall be considered to be "related to" another company, business, or person if—

(A) the company, business, or person directly or indirectly controls or is controlled by the other company, business, or person,

(B) a third party directly or indirectly controls both companies, businesses, or persons,

(C) both companies, businesses, or persons directly or indirectly control a third party and there is reason to believe that the relationship causes the first company, business, or persons to act differently than a non-related party.

For purposes of this paragraph, a party shall be considered to directly or indirectly control another party if the party is legally or operationally in a position to exercise restraint or direction over the other party.

**(c) Distribution procedures**

The Commissioner shall prescribe procedures for distribution of the continued dumping or subsidies offset required by this section. Such distribution shall be made not later than 60 days after the first day of a fiscal year from duties assessed during the preceding fiscal year.

**(d) Parties eligible for distribution of anti-dumping and countervailing duties assessed**

**(1) List of affected domestic producers**

The Commission shall forward to the Commissioner within 60 days after the effective date of this section in the case of orders or findings in effect on January 1, 1999, or thereafter, or in any other case, within 60 days after the date an antidumping or countervailing duty order or finding is issued, a list of petitioners and persons with respect to each order and finding and a list of persons that indicate support of the petition by letter or through questionnaire response. In those cases in which a determination of injury was not required or the Commission's records do not permit an identification of those in support of a petition, the Commission shall consult with the administering authority to determine the identity of the petitioner and those domestic parties who have entered appearances during administrative reviews conducted by the administering authority under section 1675 of this title.

**(2) Publication of list; certification**

The Commissioner shall publish in the Federal Register at least 30 days before the distribution of a continued dumping and subsidy offset, a notice of intention to distribute the offset and the list of affected domestic producers potentially eligible for the distribution based on the list obtained from the Commission under paragraph (1). The Commissioner shall request a certification from each potentially eligible affected domestic producer—

(A) that the producer desires to receive a distribution;

(B) that the producer is eligible to receive the distribution as an affected domestic producer; and

(C) the qualifying expenditures incurred by the producer since the issuance of the order or finding for which distribution under this section has not previously been made.

**(3) Distribution of funds**

The Commissioner shall distribute all funds (including all interest earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers based on the certifications described in para-

graph (2). The distributions shall be made on a pro rata basis based on new and remaining qualifying expenditures.

**(e) Special accounts**

**(1) Establishments**

Within 14 days after the effective date of this section, with respect to antidumping duty orders and findings and countervailing duty orders notified under subsection (d)(1) of this section, and within 14 days after the date an antidumping duty order or finding or countervailing duty order issued after the effective date takes effect, the Commissioner shall establish in the Treasury of the United States a special account with respect to each such order or finding.

**(2) Deposits into accounts**

The Commissioner shall deposit into the special accounts, all antidumping or countervailing duties (including interest earned on such duties) that are assessed after the effective date of this section under the antidumping duty order or finding or the countervailing duty order with respect to which the account was established.

**(3) Time and manner of distributions**

Consistent with the requirements of subsections (c) and (d) of this section, the Commissioner shall by regulation prescribe the time and manner in which distribution of the funds in a special account shall be made.

**(4) Termination**

A special account shall terminate after—

(A) the order or finding with respect to which the account was established has terminated;

(B) all entries relating to the order or finding are liquidated and duties assessed collected;

(C) the Commissioner has provided notice and a final opportunity to obtain distribution pursuant to subsection (c) of this section; and

(D) 90 days has elapsed from the date of the notice described in subparagraph (C).

Amounts not claimed within 90 days of the date of the notice described in subparagraph (C), shall be deposited into the general fund of the Treasury.

(June 17, 1930, ch. 497, title VII, § 754, as added Pub. L. 106–387, § 1(a) [title X, § 1003(a)], Oct. 28, 2000, 114 Stat. 1549, 1549A–73.)

REFERENCES IN TEXT

The Antidumping Act of 1921, referred to in subsecs. (a) and (b)(1)(A), probably means the Antidumping Act, 1921, act May 27, 1921, ch. 14, title II, 42 Stat. 11, as amended, which was classified generally to sections 160 to 171 of this title, and was repealed by Pub. L. 96–39, title I, § 106(a), July 26, 1979, 93 Stat. 193.

For effective date of this section, referred to in subsecs. (d)(1), (e)(1), and (2), see Effective Date note set out below.

EFFECTIVE DATE

Pub. L. 106–387, § 1(a) [title X, § 1003(c)], Oct. 28, 2000, 114 Stat. 1549, 1549A–75, provided that: ''The amendments made by this section [enacting this section]

shall apply with respect to all antidumping and countervailing duty assessments made on or after October 1, 2000.''

### TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the United States Customs Service of the Department of the Treasury, including functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(1), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

### FINDINGS OF CONGRESS

Pub. L. 106–387, §1(a) [title X, §1002], Oct. 28, 2000, 114 Stat. 1549, 1549A–72, provided that: ''Congress makes the following findings:

''(1) Consistent with the rights of the United States under the World Trade Organization, injurious dumping is to be condemned and actionable subsidies which cause injury to domestic industries must be effectively neutralized.

''(2) United States unfair trade laws have as their purpose the restoration of conditions of fair trade so that jobs and investment that should be in the United States are not lost through the false market signals.

''(3) The continued dumping or subsidization of imported products after the issuance of antidumping orders or findings or countervailing duty orders can frustrate the remedial purpose of the laws by preventing market prices from returning to fair levels.

''(4) Where dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit. Similarly, small businesses and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable.

''(5) United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved.''

SUBPART B—CONSULTATIONS AND DETERMINATIONS REGARDING QUANTITATIVE RESTRICTION AGREEMENTS

### § 1676. Required consultations

#### (a) Agreements in response to countervailable subsidies

Within 90 days after the administering authority accepts a quantitative restriction agreement under section 1671c(a)(2) or (c)(3) of this title, the President shall enter into consultations with the government that is party to the agreement for purposes of—

(1) eliminating the countervailable subsidy completely, or

(2) reducing the net countervailable subsidy to a level that eliminates completely the injurious effect of exports to the United States of the merchandise.

#### (b) Modification of agreements on basis of consultations

At the direction of the President, the administering authority shall modify a quantitative restriction agreement as a result of consultations entered into under subsection (a) of this section.

#### (c) Special rule regarding agreements under section 1671c(c)(3) of this title

This chapter shall cease to apply to a quantitative restriction agreement described in section 1671c(c)(3) of this title at such time as that agreement ceases to have force and effect under section 1671c(f) of this title or violation is found under section 1671c(i) of this title.

(June 17, 1930, ch. 497, title VII, §761, as added Pub. L. 98–573, title VI, §611(a)(4), Oct. 30, 1984, 98 Stat. 3031; amended Pub. L. 103–465, title II, §270(a)(1)(I), (b)(1)(C), (2), Dec. 8, 1994, 108 Stat. 4917.)

### AMENDMENTS

1994—Subsec. (a). Pub. L. 103–465, §270(b)(1)(C), (2), inserted ''countervailable'' before ''subsidies'' in heading. Subsec. (a)(1), (2). Pub. L. 103–465, §270(a)(1)(I), inserted ''countervailable'' before ''subsidy''.

### EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

### EFFECTIVE DATE

Section applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

### § 1676a. Required determinations

#### (a) In general

Before the expiration date, if any, of a quantitative restriction agreement accepted under section 1671c(a)(2) or 1671c(c)(3) of this title (if suspension of the related investigation is still in effect)—

(1) the administering authority shall, at the direction of the President, initiate a proceeding to determine whether any countervailable subsidy is being provided with respect to the subject merchandise and, if being so provided, the net countervailable subsidy; and

(2) if the administering authority initiates a proceeding under paragraph (1), the Commission shall determine whether imports of the merchandise of the kind subject to the agreement will, upon termination of the agreement, materially injure, or threaten with material injury, an industry in the United States or materially retard the establishment of such an industry.

#### (b) Determinations

The determinations required to be made by the administering authority and the Commission under subsection (a) of this section shall be made under such procedures as the administering authority and the Commission, respectively, shall by regulation prescribe, and shall be treated as final determinations made under section 1671d of this title for purposes of judicial review under section 1516a of this title. If the determinations by each are affirmative, the administering authority shall—

(1) issue a countervailing duty order under section 1671e of this title effective with respect

shall be treated as having been initiated on the same day as the investigation under this section, and the Commission may, in accordance with section 1677(7)(G) of this title, cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which such investigations are treated as initiated on the same day.

**(3) Time and procedure for Commission determination**

The Commission shall render its determination in the investigation conducted under this section at the same time as the Commission's determination is made in the review under section 1675(c) of this title that is initiated pursuant to this subsection. The Commission shall in all other respects apply the procedures and standards set forth in section 1675(c) of this title to such section 1675(c) of this title reviews.

(June 17, 1930, ch. 497, title VII, §753, as added Pub. L. 103–465, title II, §271(a), Dec. 8, 1994, 108 Stat. 4918; amended Pub. L. 104–295, §39, Oct. 11, 1996, 110 Stat. 3540.)

REFERENCES IN TEXT

Section 1303 of this title, referred to in subsecs. (a)(2) and (c), is defined in section 1677(26) of this title to mean section 1330 as in effect on the day before Jan. 1, 1995.

AMENDMENTS

1996—Pub. L. 104–295, §39(1), inserted "or section 1671(c)" after "section 1303" in section catchline.

Subsecs. (a)(2), (c). Pub. L. 104–295 inserted "or section 1671(c) of this title" after "section 1303 of this title" and struck out "under section 1303(a)(2) of this title" after "material injury".

EFFECTIVE DATE

Section effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as an Effective Date of 1994 Amendment note under section 1671 of this title.

URUGUAY ROUND AGREEMENTS: ENTRY INTO FORCE

The Uruguay Round Agreements, including the World Trade Organization Agreement and agreements annexed to that Agreement, as referred to in section 3511(d) of this title, entered into force with respect to the United States on Jan. 1, 1995. See note set out under section 3511 of this title.

**§ 1675c. Repealed. Pub. L. 109–171, title VII, § 7601(a), Feb. 8, 2006, 120 Stat. 154**

Section 1675c, act June 17, 1930, ch. 497, title VII, §754, as added Pub. L. 106–387, §1(a) [title X, §1003(a)], Oct. 28, 2000, 114 Stat. 1549, 1549A–73, related to the continued dumping and subsidy offset.

EFFECTIVE DATE OF REPEAL

Pub. L. 109–171, title VII, §7601(a), Feb. 8, 2006, 120 Stat. 154, provided that the repeal made by section 7601(a) is effective Feb. 8, 2006.

PROHIBITION ON COLLECTION OF CERTAIN PAYMENTS MADE UNDER THE CONTINUED DUMPING AND SUBSIDY OFFSET ACT OF 2000.

Pub. L. 111–5, div. B, title I, §1701, Feb. 17, 2009, 123 Stat. 366, provided that:

"(a) IN GENERAL.—Notwithstanding any other provision of law, neither the Secretary of Homeland Security nor any other person may—

"(1) require repayment of, or attempt in any other way to recoup, any payments described in subsection (b); or

"(2) offset any past, current, or future distributions of antidumping or countervailing duties assessed with respect to imports from countries that are not parties to the North American Free Trade Agreement in an attempt to recoup any payments described in subsection (b).

"(b) PAYMENTS DESCRIBED.—Payments described in this subsection are payments of antidumping or countervailing duties made pursuant to the Continued Dumping and Subsidy Offset Act of 2000 (section 754 of the Tariff Act of 1930 (19 U.S.C. 1675c; repealed by subtitle F of title VII of the Deficit Reduction Act of 2005 (Public Law 109–171; 120 Stat. 154))) that were—

"(1) assessed and paid on imports of goods from countries that are parties to the North American Free Trade Agreement; and

"(2) distributed on or after January 1, 2001, and before January 1, 2006.

"(c) PAYMENT OF FUNDS COLLECTED OR WITHHELD.—Not later than the date that is 60 days after the date of the enactment of this Act [Feb. 17, 2009], the Secretary of Homeland Security shall—

"(1) refund any repayments, or any other recoupment, of payments described in subsection (b); and

"(2) fully distribute any antidumping or countervailing duties that the U.S. Customs and Border Protection is withholding as an offset as described in subsection (a)(2).

"(d) LIMITATION.—Nothing in this section shall be construed to prevent the Secretary of Homeland Security, or any other person, from requiring repayment of, or attempting to otherwise recoup, any payments described in subsection (b) as a result of—

"(1) a finding of false statements or other misconduct by a recipient of such a payment; or

"(2) the reliquidation of an entry with respect to which such a payment was made."

DISTRIBUTIONS ON CERTAIN ENTRIES

Pub. L. 111–291, title VIII, §822, Dec. 8, 2010, 124 Stat. 3163, as amended by Pub. L. 111–312, title V, §504(a), Dec. 17, 2010, 124 Stat. 3308, provided that: "Notwithstanding section 1701(b) [probably means 7601(b)] of the Deficit Reduction Act of 2005 (Public Law 109–171; 120 Stat. 154 (19 U.S.C. 1675c note) [set out below]) or any other provision of law, no payments shall be distributed under section 754 of the Tariff Act of 1930 [this section], as in effect on the day before the date of the enactment of such section 1701 [probably means 7601, which was approved Feb. 8, 2006], with respect to the entries of any goods that are, on the date of the enactment of this Act [Dec. 8, 2010]—

"(1) unliquidated; and

"(2)(A) not in litigation; and

"(B) not under an order of liquidation from the Department of Commerce."

[Pub. L. 111–312, title V, §504(b), Dec. 17, 2010, 124 Stat. 3308, provided that: "The amendment made by subsection (a) [amending section 822 of Pub. L. 111–291, set out above] shall take effect as if included in the provisions of the Claims Resolution Act of 2010 [Pub. L. 111–291]."]

Pub. L. 109–171, title VII, §7601(b), Feb. 8, 2006, 120 Stat. 154, provided that: "All duties on entries of goods made and filed before October 1, 2007, that would, but for subsection (a) of this section [repealing this section], be distributed under section 754 of the Tariff Act of 1930 [this section], shall be distributed as if section 754 of the Tariff Act of 1930 had not been repealed by subsection (a)."

SUBPART B—CONSULTATIONS AND DETERMINATIONS REGARDING QUANTITATIVE RESTRICTION AGREEMENTS

## § 1676. Required consultations

### (a) Agreements in response to countervailable subsidies

Within 90 days after the administering authority accepts a quantitative restriction agreement under section 1671c(a)(2) or (c)(3) of this title, the President shall enter into consultations with the government that is party to the agreement for purposes of—

(1) eliminating the countervailable subsidy completely, or

(2) reducing the net countervailable subsidy to a level that eliminates completely the injurious effect of exports to the United States of the merchandise.

### (b) Modification of agreements on basis of consultations

At the direction of the President, the administering authority shall modify a quantitative restriction agreement as a result of consultations entered into under subsection (a) of this section.

### (c) Special rule regarding agreements under section 1671c(c)(3) of this title

This chapter shall cease to apply to a quantitative restriction agreement described in section 1671c(c)(3) of this title at such time as that agreement ceases to have force and effect under section 1671c(f) of this title or violation is found under section 1671c(i) of this title.

(June 17, 1930, ch. 497, title VII, § 761, as added Pub. L. 98–573, title VI, § 611(a)(4), Oct. 30, 1984, 98 Stat. 3031; amended Pub. L. 103–465, title II, § 270(a)(1)(I), (b)(1)(C), (2), Dec. 8, 1994, 108 Stat. 4917.)

AMENDMENTS

1994—Subsec. (a). Pub. L. 103–465, § 270(b)(1)(C), (2), inserted "countervailable" before "subsidies" in heading.

Subsec. (a)(1), (2). Pub. L. 103–465, § 270(a)(1)(I), inserted "countervailable" before "subsidy".

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE

Section applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

## § 1676a. Required determinations

### (a) In general

Before the expiration date, if any, of a quantitative restriction agreement accepted under section 1671c(a)(2) or 1671c(c)(3) of this title (if suspension of the related investigation is still in effect)—

(1) the administering authority shall, at the direction of the President, initiate a proceeding to determine whether any countervailable subsidy is being provided with respect to the subject merchandise and, if being so provided, the net countervailable subsidy; and

(2) if the administering authority initiates a proceeding under paragraph (1), the Commission shall determine whether imports of the merchandise of the kind subject to the agreement will, upon termination of the agreement, materially injure, or threaten with material injury, an industry in the United States or materially retard the establishment of such an industry.

### (b) Determinations

The determinations required to be made by the administering authority and the Commission under subsection (a) of this section shall be made under such procedures as the administering authority and the Commission, respectively, shall by regulation prescribe, and shall be treated as final determinations made under section 1671d of this title for purposes of judicial review under section 1516a of this title. If the determinations by each are affirmative, the administering authority shall—

(1) issue a countervailing duty order under section 1671e of this title effective with respect to merchandise entered on and after the date on which the agreement terminates; and

(2) order the suspension of liquidation of all entries of subject merchandise which are entered, or withdrawn from warehouse for consumption, on or after the date of publication of the order in the Federal Register.

### (c) Hearings

The determination proceedings required to be prescribed under subsection (b) of this section shall provide that the administering authority and the Commission must, upon the request of any interested party, hold a hearing in accordance with section 1677c of this title on the issues involved.

(June 17, 1930, ch. 497, title VII, § 762, as added Pub. L. 98–573, title VI, § 611(a)(4), Oct. 30, 1984, 98 Stat. 3032; amended Pub. L. 103–465, title II, §§ 233(a)(5)(Z), (AA), 270(a)(1)(J), Dec. 8, 1994, 108 Stat. 4900, 4917.)

AMENDMENTS

1994—Subsec. (a)(1). Pub. L. 103–465, §§ 233(a)(5)(Z), 270(a)(1)(J), inserted "countervailable" before "subsidy" in two places and substituted "subject merchandise" for "merchandise subject to the agreement".

Subsec. (b)(2). Pub. L. 103–465, § 233(a)(5)(AA), substituted "subject merchandise" for "merchandise subject to the order".

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

**Form 30**

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

October 10, 2014

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| Terence P. Stewart | /s/ Terence P. Stewart |
|---|---|
| Name of Counsel | Signature of Counsel |

Law Firm  Stewart and Stewart

Address  2100 M Street, NW

City, State, ZIP  Washington, DC 20037

Telephone Number  (202) 785-4185

FAX Number  (202) 466-1286

E-mail Address  tstewart@stewartlaw.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

**FORM 19.**    **Certificate of Compliance With Rule 32(a)**

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☒    The brief contains    **[ 13, 269 ]**    words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐    The brief uses a monospaced typeface and contains [*state the number*] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or FRAP 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒    The brief has been prepared in a proportionally spaced typeface using [ ***Microsoft Word*** ]    in    [ ***Times New Roman, 14 point font*** ], or exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐    The brief has been prepared in a monospaced typeface using [ *state name and version of word processing program* ] with [ *state number of characters per inch and name of type style* ].

**/s/ Terence P. Stewart**
(Signature of Attorney)


**Terence P. Stewart**
(Name of Attorney)


**Counsel for The Timken Company and MPB Corporation, Defendants-Appellees**
(State whether representing appellant, appellee, etc.)


**October 10, 2014**
(Date)
